## BARNUM BLAKE

*v.*

## CHRISTINE BLAKE.

1. WITNESS—*credibility of hired detective.* The testimony of a private detective hired by a husband to watch his wife, with a view of learning facts upon which to base a suit for a divorce, will be regarded with much suspicion, especially where it does not appear that his pay does not depend upon the successful effect of his evidence.

2. SAME—*credibility as affected by the improbability of the testimony and feelings of witness.* Where the story of two witnesses, sons of the complainant in a bill for divorce, is improbable in itself, and they are shown to be under the influence and control of their father, and very hostile towards their mother, the defendant, and the statements of one of them out of court is in conflict with his testimony, this will have the effect to greatly impair and discredit their evidence.

3. EVIDENCE—*adultery may be proved by circumstances.* Adultery may be established by circumstantial evidence, but the proof must convince the mind affirmatively that actual adultery was committed, as nothing short of the carnal act can lay a foundation for a divorce.

4. If a married woman is shown, by undoubted proof, to have been in an equivocal position with a man not her husband, leading to a suspicion of adultery, and it is proved that she had previously shown an unwarrantable predilection for that man; that they had been detected in clandestine correspondence, had stolen interviews, made passionate declarations; that her affections were alienated from her husband, and that her mind and heart were already depraved, and nothing remained wanting but an opportunity to consummate the guilty purpose, then proof that such opportunity had occurred, will lead to the satisfactory conclusion that the act has been committed. But, when these circumstances are wanting, the proof of opportunity and equivocal appearances affords no evidence of adultery.

5. DIVORCE—*proof of adultery should be clear.* It being important to the well-being of society that the marriage relation should not be severed, clear proof should be required, where a divorce is sought from a wife for adultery.

6. SAME—*reasonableness of solicitor's fee.* The court, on the hearing of a bill for divorce brought by the husband against his wife, after verdict in favor of the wife, required the complainant within thirty days to pay the defendant's solicitors $6000 in addition to $1000 already paid: *Held*, that the fee was excessive, and the same was reduced to $2000 in all.

7. NEW TRIAL—*newly discovered evidence.* A new trial will not be granted on the ground of newly discovered evidence, which is merely cumulative, and which, if admitted, would be so unreliable and suspicious that it ought not to be believed.

APPEAL from the Superior Court of Cook county; the Hon. JOSEPH E. GARY, Judge, presiding.

Messrs. HERVEY, ANTHONY & GALT, and Mr. JOSEPH N. BARKER, for the appellant.

Mr. S. K. DOW, for the appellee.

Mr. JUSTICE CRAIG delivered the opinion of the Court:

This was a bill for divorce, filed by Barnum Blake against Christine Blake, in the circuit court of Cook county. A change of venue was subsequently taken to the Superior Court.

The bill charged that the defendant committed adultery with one Thomas M. Thompson, at various times, in Cook county.

The defendant filed an answer under oath, in which she denied each and every charge of adultery alleged in the bill, and expressly denied that she ever, at any time or place, committed adultery with Thompson or any other person.

The defendant also filed a cross-bill, in which she charged the complainant with extreme and repeated cruelty, and adultery, and prayed for a divorce. The complainant answered the cross-bill, under oath, denying the charges therein, and alleged that the defendant was guilty of drunkenness, vulgarity and lewdness.

In July, 1872, a trial was had before a jury, which resulted in a verdict that the defendant was not guilty of the adultery charged. No evidence was introduced in support of the cross-bill.

The complainant filed a motion for a new trial, which was overruled, and a decree signed according to the finding of the jury.

The complainant brings the cause to this court by appeal, and asks a reversal of the decree on the following grounds: 1st. Because the verdict is contrary to the evidence. 2d. The court erred in instructing the jury. 3d. The court erred in not granting a new trial on the ground of newly discovered evidence. 4th. The court erred in allowing solicitors' fees to defendant's solicitors.

It appears by the record that these parties were married in 1851, in the State of Wisconsin. At the time of their marriage the defendant was 16 years of age and the complainant was 34; that about three months before their marriage the complainant obtained a divorce from a former wife, on the ground of adultery. They resided in Wisconsin until 1867, when they moved to Winnetka, in Cook county, where they resided until the 8th day of June, 1870, when complainant

drove defendant from his house. They have five children, residing with complainant at Winnetka.

It further appears that T. M. Thompson resides in Winnetka, near the residence of complainant; that he is a lawyer by profession, a married man, keeps an office in Chicago, where he is engaged in the practice of law; that Winnetka is a village sixteen miles from Chicago, containing about thirty houses; that the residents of Winnetka, most of them, do business in Chicago, and travel to and from Chicago morning and evening, on the cars.

The evidence of the complainant to prove adultery is entirely circumstantial. No direct or positive proof of the commission of the act was introduced.

The first and main testimony relied upon to establish adultery, was that of one Gleason, who was a hired detective, residing in Chicago. He was employed in October, 1869, and from that time until May, 1870, he followed and watched the defendant and Thompson each time she went to Chicago. During that time, he swears to twelve or fourteen visits she made to Chicago, and was in company with Thompson on the street and in the office of Thompson & Osborn. He swears that he met them at the depot, and followed them in their walks on the street: followed them to the office of Thompson, where the defendant would sometimes remain a short time, and on other occasions, as long as an hour or longer.

If the testimony of this witness was entirely reliable, it is barely possible that adultery was committed, but it is not probable. It is to be remembered that these meetings of the defendant and Thompson occurred in the day time, on the street of a populous city, at the office of an attorney, during business hours, where the public were invited to go to transact legal business. On the streets she never took his arm; in the office, no improper intimacy was observed by this ever watchful hired searcher after crime; save, on one occasion, he saw Thompson's hand upon her lap. If the defendant's chastity was not above reproach, and her virtue as pure as the purest,

it is astonishing that this witness, with all his vigilance, research, and his eyes ever on the defendant when she was in the city, during a period of six months, did not discover more.

But the important question arises, were the jury bound to believe the testimony of this witness? He was employed by the complainant to dog and follow the tracks of his wife in a secret manner, and learn what facts he could, for the purpose of becoming a witness against her. Up to the time this cause was tried, he had received $350, and his account was still unsettled. How much more he is to receive, or whether the amount depended upon the effect his evidence should produce on the jury, is not disclosed. He was uncorroborated, although others were about the office at the times he swears to the interviews. None are called to sustain and corroborate what he saw and testified to. This is somewhat remarkable; and, when considered in connection with the fact that he was in the employ of complainant, is calculated to cast suspicion upon his evidence.

It is said, in Browning on the Laws of Marriage and Divorce, citing from Sir CRESSWELL: "The employment of a private detective, for the purpose of getting up evidence, though in some few cases they may afford useful assistance, is, as a rule, very objectionable. They are most dangerous agents, and the court looks upon their evidence with much suspicion. When a man sets up as a hired discoverer of supposed delinquencies, when the amount of his pay depends upon the extent of his employment, and the extent of his employment depends upon the discoveries he is able to make, then the man becomes a most dangerous instrument."

While it is true, under the law, Gleason was a competent witness, yet his credibility was a question solely for the jury. Aside from the evidence of Gleason, the complainant is compelled to rely alone on the conduct of the defendant and the accomplice at Winnetka, to establish adultery.

The conduct proven at Winnetka, aside from what was shown by the testimony of the two small sons of complainant, of which we shall speak hereafter, consisted of frequent walks and drives that the defendant and Thompson had together. Sometimes they rode and walked alone; on other occasions, in company with the wife of Thompson. That there was any improper intimacy between them on any of these occasions, the evidence entirely fails to show.

One of complainant's witnesses, Schoder, testifies, on a Sunday night in May, 1870, at 11 o'clock, he saw the defendant, in company with Thompson, walking towards Wright's grove. The next witness called by complainant swears that he walked past Wright's grove, on the night in question, with Mrs. Blake, and that with the knowledge and consent of complainant. This illustrates very fairly two things, *first*, that it is not safe to place too great reliance on that class of evidence to establish adultery; *second*, that Mrs. Blake's walks and rides were not altogether without the knowledge and approbation of her husband. Great reliance is, however, placed on the evidence of complainant's two sons, one 15 years old and the other 11. They testify that, on a certain night their mother came home at 12 o'clock, Thompson with her. These boys, as they say, were up playing chess; that the defendant and Thompson went in the library. They having heard the rattle of bottles in the wine-closet, slipped down stairs, one at a time, and looked in from the hall to the library, and saw a bottle and two glasses on the table, and the defendant and Thompson on the sofa, in a reclining position, she with her head on his shoulder, and he with his arm around her waist. The story of these boys seems to agree in every respect. It is, however, somewhat remarkable that they should be up at this late hour of the night engaged in a game of chess, at which a boy of 11 years would, ordinarily, soon tire, and no mention is made of the whereabouts of the servants, three of whom were employed at the house at the time. It is, however, to be remembered that these boys were

under the influence and control of their father, and it appears that the older one, at least, was very hostile towards his mother. Huxon testifies that, after Mrs. Blake left, he heard the older son call his mother a "damned bitch," and on being told he ought to be ashamed of himself, said he knew nothing about his mother only what he had been told. Another witness testifies to similar expressions made by the boy.

The fact that boys the age of these being up at a late hour of the night unaccounted for, the influence of their father over them, their story in every respect agreeing, the bitter feelings they entertained towards their mother, the statement made by one of them out of court in direct conflict with what he testified on the stand, no doubt had great weight on the minds of the jury to discredit their evidence.

There were other facts in evidence in this case that, no doubt, had great weight with the jury, and went far to convince them that the intimate relations existing between the defendant and Thompson were not of a criminal character. It was proven that, for a number of years, the Blake and Thompson families have been on very friendly and intimate terms. In 1869, complainant and his wife went on a tour South, and were gone several months. In their absence, their children were left in the care of the Thompsons. Complainant entrusted Thompson with the payment of his taxes on his Winnetka property. On their return, Thompson was presented with a cane cut by Blake, in the South. Thompson and his wife frequently dined at Blake's residence with Blake and his family, and Blake, in his evidence, does not deny the fact that, on Sunday before he drove his wife from his home, Thompson and his wife dined with complainant at his residence. These things are shown to exist in the face of the further fact that, as early as 1868, complainant was suspicious that Thompson and his wife were committing adultery.

It is insisted by appellant that the circumstances proven were amply sufficient to establish the fact that adultery was committed. There can be no doubt but adultery may be

established by circumstantial evidence, but the proof, says Bishop, vol. 2, page 613, "must convince the judicial mind affirmatively that actual adultery was committed, since nothing short of the carnal act can lay a foundation for divorce."

We have been referred by the solicitors for complainant to an opinion delivered by Chief Justice SHAW, in the case of *Dunham* v. *Dunham,* which is quoted as good authority by Bishop, in the 2d vol. of his work on Marriage and Divorce, sec. 616, as being directly in point in this case, in which it is said: "It is impossible, therefore, to lay down beforehand, in the form of a rule, what circumstances shall and what shall not constitute satisfactory proof of the act of adultery, because the same facts may constitute such proof or not, as they are modified and influenced by different circumstances. Suppose, for instance, a married woman had been shown, by undoubted proof, to have been in an equivocal situation with a man not her husband, leading to a suspicion of the fact. If it were proved that she had previously shown an unwarrantable predilection for that man; if they had been detected in clandestine correspondence; had sought stolen interviews; made passionate declarations; if her affection for her husband had been alienated; if it were shown that the mind and heart were already depraved, and nothing remained wanting but an opportunity to consummate the guilty purpose, then proof that such opportunity had occurred, would lead to the satisfactory conclusion that the act had been committed. But when these circumstances are wanting—when there has been no previous unwarrantable or indecent intimacy between such parties, no *clandestine correspondence,* or stolen or secret interviews—the fact of opportunity and equivocal appearances would hardly raise a passing cloud of suspicion over the fair fame of such a woman."

Under the rules laid down in that case, the evidence in this, in several respects, is very deficient. No clandestine correspondence is shown; not a single word or expression is proved to have been uttered by defendant showing her attach-

ment to Thompson. No sign or token of affection is shown to exist. The rides and walks taken by them, so far as proof is concerned, seem to be destitute of the characteristics which would ordinarily lead a jury to the conclusion that adultery had been committed where the opportunity existed.

It is exceedingly important for the well-being of society that a check should be placed upon the tendency of the age to sever the marriage relation, and more especially should clear proof be required when the result of the verdict sought to be obtained will publish a defendant to the world as a prostitute, and brand the children of complainant as the descendants of an unchaste woman.

We are not, therefore, upon a careful consideration of all the testimony, prepared to say the verdict is against the weight of the evidence.

It is insisted by the solicitors for complainant, that the court erred in refusing to give his fifth, seventh, ninth, fourteenth and fifteenth instructions.

The substance of the fifth and seventh instructions is embraced in complainant's fourth, which was given.

The ninth was substantially like the sixth, which was given.

The fourteenth was properly refused, for the reason that the record does not show the evidence of Huxen and his son and Millard was withdrawn from the consideration of the jury.

The fifteenth was not proper, for there was no evidence on which to base it.

We perceive no error in the instructions given for defendant.

The instructions given for complainant and defendant, when considered together, fairly presented the law applicable to the case to the jury.

The next point relied on is, that the court erred in not granting a new trial, on the ground of newly discovered evidence.

It is shown that the newly discovered testimony sought to be produced, is that of Dr. Turner and his wife, who swear that the defendant wrote Dr. Turner a letter, in which she, admitted she had committed adultery with Thompson four or five times in his office, and also at Lake View, and that subsequently in a conversation at the St. James Hotel, in Chicago, she admitted substantially the same. The letter purporting to contain these admissions is not produced, although other letters written by the defendant to Dr. Turner are shown.

It appears that this Dr. Turner had informed the defendant that he could produce evidence to show the complainant guilty of adultery, and that he was employed for that purpose, and acted some time in that capacity ; that finally there was a misunderstanding between him and defendant, in regard to the pay he should receive. A number of letters passed between them, which show very clearly that all Turner was after was money—the result of which was, Turner, not having realized as much from the defendant as he expected, after the trial was over he turns up in communication with the complainant, and, as near as we can understand from the letters and affidavits filed, proposes to sell out and swear on the other side of the case.

There are two reasons, either one of which is ample to justify the court in overruling the motion for a new trial :

*First*—This testimony sought to be produced was merely cumulative.

*Second*—The evidence of these Turners sought to be produced is shown, by the facts contained in this record, to be unreliable and utterly unworthy of credit. A party who will expose one side of a cause as did these Turners, and work in the interest of that side as they have done, and then turn upon the other side and betray the confidence reposed in them, and exhibit confidential letters and contracts as they did, could not and should not be believed by any honest jury in the land.

The last point relied upon is, the amount allowed for solicitors of the defendant is exorbitant.

It appears that $1000 had already been paid by complainant for solicitors' fees of the defendant. The court, in addition to that sum, decreed that the complainant should, within thirty days, pay an additional sum of $6000.

We are satisfied that this allowance is too much. While it is true there has been a large amount of labor in the defense of the cause, yet it has been performed chiefly by one solicitor, and we are inclined to the opinion that $2000 ought to be regarded as reasonable compensation. That portion of the decree will therefore be modified so that the amount to be paid, in addition to what had been paid at the time the decree was rendered, shall be $1000.

In all other respects the decree will be affirmed.

*Decree affirmed.*

Mr. JUSTICE SCOTT : I concur in the decision affirming the decree in this cause.

Mr. CHIEF JUSTICE BREESE : I have examined this record, and, as I read it, testimony of the most satisfactory character is found in it to justify a divorce *a vinculo.* It is true, appellee was not caught *flagrante delicto,* but such circumstances are proved as to force conviction upon the mind that the act was done. I do not suppose it is required of a party applying for a divorce to prove, beyond all reasonable doubt, that adulterous intercourse was actually had, but such facts as warrant that conclusion. That appellee had violated her marriage vows is satisfactorily proved, if circumstances are available to prove any thing.

I have no time to go into a review of the testimony. The salient facts proved are, that Thompson was an object of appellee's special regard, and they were on terms of closest intimacy, she bestowing upon him favors which no virtuous wife would bestow without the knowledge of her husband. The most familiar intercourse with Thompson is established,

such as riding out with him repeatedly in her buggy, returning after night fall; walking with him, "arm in arm;" strolling to the lake shore at a late hour of the night, on the pretense of seeing "the moon rise;" visiting him time and again at his office in Chicago, and then found with him alone, his hand in her lap. On one occasion, they were seen together in the office of Thompson, which had a partition setting off a portion of it for a sitting room, furnished with a chair or two and a lounge; a bolt was heard to slide, and presently, in looking into the outer room, it was found to be vacant. Again, she hurried the servants to church, on one Sabbath, appellant having gone there with one of the children, when, on the return of the servants from church, they discovered Thompson in the green house, he carefully closing the door. Again, her two sons, one aged fifteen and the other thirteen, both testify that they have known their mother, in their father's absence from home, go out riding with Thompson three or four times a week, in the evening between six and eight o'clock; sometimes later; have known them to come back as late as eleven o'clock at night, which they never did when appellant was at home. They swear that she came home with Thompson one night, during their father's absence, about twelve o'clock; there was no light in the hall and none in the parlor; she told Thompson to step into the library, and she would be down in a minute; she ran up stairs, when the rattling of bottles was heard; she soon returned, and they were seen in the library, the light burning very low, a bottle and two glasses on the table, and they reclining on the sofa, her head on Thompson's shoulder, and his arm around her waist. It is not strange these boys should be awake at that hour of the night, as they were sitting up to watch for their mother, and let her in, the servants, no doubt, fatigued with their day's work, having gone to bed. There was no testimony worthy of consideration, to shake the testimony of these boys. The eldest was then a pupil at Racine College, and

justly indignant at the conduct of his mother, in so taking advantage of his father's absence.

It is urged, as a reason why the evidence of frequent intercourse with Thompson, and visits at his office, should not have weight with the jury, that the witness named Gleason was one of "Pinkerton's detectives," and employed for the purpose of watching appellee's movements and conduct.

This court, in *Bennet et al.* v. *Waller et al.* 23 Ill. 97, did not hesitate to repose confidence in the testimony of Webster, a "Pinkerton detective," and were so influenced by it as to decree an estate to be the property of defendants in error, then valued at five hundred thousand dollars!

It seems to me, though appellee was not caught *flagrante delicto*, the proof sufficiently shows she had, on divers occasions, and at divers times, shown an unwarrantable predilection for Thompson; that they had been seen together, time and again, in equivocal positions, and at late and unusual hours of the night; on one occasion going to the lonely lake shore, "to see the moon rise," all which must be considered in the light of stolen interviews, and though no clandestine correspondence be proved, which, in this case, is not necessary to be proved, if, by that term, is meant letters passing to and from, as the parties were together almost every day, riding in the same cars or meeting at Thompson's house. Add to these the fact that the affection of her husband had been alienated by her conduct, we see nothing wanting to force the conclusion appellee had violated her marital vows.

Appellee, in her cross-bill, overwhelmed appellant with the most abusive charges, not one of which did she attempt to substantiate by proof—not one. She, too, employed "detectives," though not of "Pinkerton's force," to spy out the shortcomings of appellant, but proved nothing. She should not complain if her husband used the same instruments as she used, and which this court has sanctioned.

Of all these private interviews at Thompson's office and in the library; riding out and returning late in the evening;

wanderings to the lake shore to see the moon rise, and to Wright's grove to hear the rustling of the foliage as the evening winds whispered through it; of the many small favors bestowed by appellee upon him, appellant was profoundly ignorant, until, through subsequent communications, he became informed of them.

In the opinion, as delivered, all these weigh nothing, and are insufficient to establish guilt. Henceforth, no married woman need have the least apprehension of disgrace or dishonor, or of a decree of divorcement, who is not so unfortunate as to be caught *flagrante delicto*. I am of opinion the testimony compelled a verdict of guilty, and a divorce *a vinculo* should have followed.

Mr. JUSTICE McALLISTER: I fully concur in the dissenting opinion of Mr. CHIEF JUSTICE BREESE.

Mr. JUSTICE SCHOLFIELD: I also concur with Mr. CHIEF JUSTICE BREESE, in his dissenting opinion.