# Hiram T. Gilbert, Appellee, v. William Bross Lloyd et al., Appellants.

## Gen. No. 16,493.

1. VERDICTS—*what not considered in determining question as to whether it is against the weight of the evidence.* In determining whether the verdict rendered was against the manifest weight of the evidence the appellate court will not consider at whose instance a jury trial was had.

Gilbert v. Lloyd, 170 Ill. App. 436.

2. VERDICTS—*power of appellate court to set aside, rendered for attorney's fees.* The appellate court is as free to set aside an excessive verdict in favor of a lawyer against his client as it is to set aside any other verdict which is contrary to the manifest weight of the competent evidence. Indeed, its power, if anything, should be the more readily exercised, inasmuch as the evidence is largely of opinion character and the element of seeing the witnesses and observing their demeanor is not so important.

3. VERDICTS—*when set aside as against the evidence.* When the verdict of a jury is contrary to the weight of the evidence, it is the duty of the appellate court to so declare, and to set aside the judgment based upon such finding.

4. ATTORNEY AND CLIENT—*how value of services to be determined.* While opinion evidence is proper and should be considered the appellate court is qualified to form and is entitled to exercise an independent judgment.

5. ATTORNEY AND CLIENT—*how value of services to be determined.* In determining the compensation which should be awarded for legal services, the question is as to the usual, customary and reasonable charge for like services, and such rule is to be followed notwithstanding there exists wide differences of opinion between the lawyers called as experts.

6. EVIDENCE—*when competency of expert not subject to review.* If the qualification of an expert to express an opinion as to the value of legal services is not preserved by objection, the question of such competency is not open for review, but the infirmity of the testimony given may be considered by the court.

Appeal from the Municipal Court of Chicago; the HON. FREEMAN K. BLAKE, Judge, presiding. Heard in the Branch Appellate Court at the March term, 1912. Reversed and remanded. Opinion filed April 19, 1912. Rehearing denied May 9, 1912.

SCOTT, BANCROFT & STEVENS, for appellants.

EDWARD W. EVERETT and SAMUEL S. PAGE, for appellee.

MR. JUSTICE F. A. SMITH delivered the opinion of the court.

This is an appeal by William Bross Lloyd, Henry Demarest Lloyd and Demarest Lloyd from a judgment for $40,000, in favor of Hiram T. Gilbert for services rendered as an attorney.

The case was tried by the plaintiff upon the theory that there was no usual and customary charge for services of the character rendered and that the issue should be what was "fair and reasonable compensation."

It is urged in seeking a reversal of the judgment that the services rendered were not exceptional in character; that the fee claimed was extortionate and grossly disproportioned to the value of the services rendered; that the judgment is oppressive and palpably against the weight of evidence; and that the $10,000 paid appellee before the suit was instituted was not only adequate but generous compensation for the services rendered by appellee.

In support of this contention it is urged:

First: That the fee is not justified by any consideration of the amount involved, for the clients, appellants, were not financially interested in any possible result of the proceedings;

Second: That it is not justified by the time devoted by the plaintiff below to the service of his clients, the service extending over a period of less than four months during which other matters of importance engaged a considerable portion of appellee's attention;

Third: That it is not justified by the difficulty or complexity of the legal questions involved for no such questions were involved;

Fourth: That it is not justified by the proceedings instituted all of which were of an ordinary character and none of which were brought to a contested hearing, and in fact, plaintiff below rendered practically no service in court, and

Fifth: That it is not justified by the results achieved, for the plaintiff according to his own evidence, accomplished nothing which he set out to do; that on the contrary the result was a surrender to alleged conspirators whose purposes he was employed to defeat.

At the outset it is important to bear in mind a correct impression of the extent of appellee's services, and not confound them with the litigation spoken of in the record called the William Bross will suit. In that suit appellee took no substantial part and contributed nothing to the result reached. The issues involved therein were decided in favor of appellants and John B. Lloyd before appellee was retained. Nor did he have anything to do with the making of the several trust agreements between the Lloyd heirs which are set out in the record. The interlocutory decree determining the rights of the parties under the will of William Bross was entered July 18, 1908. Appellee was employed either in November or December following. That employment was for a different purpose and entirely supplementary to the will suit. The clear understanding and purpose for which appellee was employed by appellants, the brothers of John Bross Lloyd, was to take steps for the preservation of the property and person of John Bross Lloyd, a younger brother of appellants, who, when he was a little over twenty years of age, became completely under the influence of a married woman twice his age, named McGraw. For some time he lived at her house near Boston. During the summer or early fall of 1907, appellants became uneasy as to his state of mind, and also as to the influence of the McGraw woman over him. In December, 1907, they learned that he had employed as his attorney one William D. Sprout, and that the latter was counsel for a company by which Mrs. McGraw's husband was employed. It was believed by them that the influence of Sprout would be an extension of the influence of Mrs. McGraw, and it was feared that there might be a conspiracy to get John Bross Lloyd's property away from him.

Acting under that fear appellants employed Powers & Hall, attorneys of Boston, early in January, 1908. These attorneys employed detectives who reported to

them, and they considered, analyzed and prepared the evidence thus obtained for use in court. It was proposed to have a conservator appointed for John Bross Lloyd in order to tie up his estate as determined by the will suit above referred to. Some months after their employment the Boston attorneys advised appellants that in their opinion the necessary proceedings should be taken in Chicago for the reason that the Massachusetts courts would not have jurisdiction.

Miss Miller, who was counsel in the will suit, was consulted in regard to the situation of John B. Lloyd. When the Boston attorneys advised that proceedings be brought in Cook county, appellants did not feel that they could ask Mr. Rosenthal to take steps against their brother who had been represented by him in the will suit. During the pendency of the William Bross will suit early in the summer of 1908 Miss Miller had brought the will to appellee with the request that he read it over, and she talked over the situation with appellee with reference to John Bross Lloyd. When the necessity for additional counsel arose, she induced William B. Lloyd to consider the employment of appellee in the matters relating to John Bross Lloyd. According to appellee's testimony Miss Miller wrote him November 9, 1908, he being then at West Baden, stating that she was authorized to employ him as counsel in a partition suit of Lloyd vs. Lloyd, to be started as soon as the litigation concerning the will should be terminated. Appellee testified that the appellant William Bross Lloyd was a resident of Chicago, and acted for himself and other appellants who were residents of Boston. William Bross Lloyd employed appellee between the 18th and 20th of December, 1908, in relation to the matters of John Bross Lloyd and his estate. The period, therefore, during which appellee performed services under the employment of appellants, began about the 18th of December, 1908, and terminated, according to

the evidence, on the 31st of March, 1909. All matters in controversy, however, in which appellee participated were settled on the 15th day of February, 1909.

It appears from the record that during this period appellee was engaged in other important matters. He had a bill pending in the Illinois Legislature to change the act in relation to the practice in the courts of Illinois, which was introduced in the early part of January, 1909. He testified that between the time the Legislature opened and the 30th day of March about twenty days of his time was taken up in attendance at Springfield in the matter. According to his testimoney he was also engaged in the case of the State of Illinois against the Illinois Central Railroad company, involving thirty or forty millions of dollars. He stated that the Illinois Central railroad case occupied about ten days of his time as near as he could recollect. He was also engaged during this same period for two or three days in the Slaughter case, as it is called, and also in the business that a lawyer has in his office every day. The actual time, therefore, in which appellee could have been performing any service for appellants, including Sundays and holidays, was about sixty-seven days, and the total time between his employment and the termination of his services involved about one hundred and seven days.

In his testimony appellee says that he is unable to say how many actual days' work he put in on these matters because he never kept books and never worked for people who asked him to keep books.

Prior to the retaining of appellee, Powers & Hall, the Boston attorneys, and Miss Miller proposed filing a bill for partition and procuring the appointment of a conservator in Cook County for John Bross Lloyd. Appellee testifies that he was retained for the purpose of this partition suit, which was to be one of the proceedings to tie up John Bross Lloyd's property. To that end he made himself familiar with the proceed-

ings in the will suit and the will of William Bross Lloyd. This bill for partition was prepared by appellee and Miss Miller in accordance with the suggestions of Powers & Hall, but the bill was never filed, appellee advising William Bross Lloyd that it would not answer the purpose, nor would proceedings for a conservator. The bill in the William Bross will suit had averred that John Bross Lloyd was a resident of Massachusetts, and appellee was of the opinion that a conservator could not be appointed for a non-resident. It was then suggested by appellee that a supplemental bill be filed in the William Bross will suit setting forth that John was incompetent to manage his own affairs, and asking the court on final distribution to put his property in the hands of a receiver or trustee. Appellant, William Bross Lloyd, agreed that this should be done, but wished the opinions of his brothers. For that purpose Miss Miller went to Boston and submitted the suggestion to Powers & Hall and Henry D. and Demarest Lloyd, and it was approved. The object of this supplemental bill was to get a distribution of the estate without permitting John Bross Lloyd to receive his share. Appellee prepared the bill and it was filed January 4, 1909. Henry D. and Demarest Lloyd were complainants and John B. Lloyd and William Bross Lloyd defendants. Appellee appeared as solicitor for complainants and Miss Miller for William Bross Lloyd. That bill after setting out the proceedings in the original suit, alleged that John was a distracted person, and that his interest in the William Bross property, worth upwards of seven hundred fifty thousand dollars, would be dissipated if given to him; that his legal residence was in Cook county, and that he was sojourning in Malden, Massachusetts, and was under the control of designing persons believed to be conspiring to defraud him of his property, and that William Bross Lloyd, a resident of Cook county, had refused to join in the supple-

mental bill and in proceedings to procure a conservator for John. The bill prayed that a receiver be appointed to receive John's share of the trust estate, and that the court by decree protect the latter's rights.

Upon the filing of the bill and without notice or contest, Mr. Galt, who was trustee under the will of William Bross, was appointed temporary receiver. The appointment effected no change in the situation and afforded no protection to John's estate for Galt continued to hold as trustee. Appellee Gilbert testified that a receiver was not necessary but he wanted one for the moral effect on John Bross Lloyd and his lawyer.

Except for the filing of an answer by John Bross Lloyd no further proceedings were had under the supplemental bill, which was dismissed with leave to withdraw it from the files March 29, 1909.

On the same day that the supplemental bill was filed, and in pursuance of a plan agreed upon between appellee and Miss Miller, the latter filed a petition for a conservator of John Bross Lloyd in the Probate Court of Cook county, although appellee had already advised appellants that a proceeding for a conservator would not accomplish the purpose desired by them. Appellee testified that he did not think he could prevail in the conservatorship proceedings; that he had no great faith in it, but thought that it might be beneficial in tying-up the property. It would have a moral effect, at any rate, upon the other side. No service was obtained under the petition for a conservator, and there was of course no hearing upon it, and it was ultimately dismissed.

Appellee and Miss Miller then prepared and filed a bill for partition of the property inherited by the four Lloyd brothers from their mother, none of which was involved in the William Bross will litigation. This bill was but a step taken by appellee in the effort to tie up John's property and prevent it from coming

into his possession and control. The bill was filed January 11, 1909, in the Circuit Court of Cook County. Henry D. and Demarest Lloyd were complainants and William and John and others were defendants. The bill set forth the contents of the will of the mother, Jessie Bross Lloyd, and set out in full certain agreements which had been entered into by the four brothers in reference to the property devised to them by her, described the property and alleged that John was a distracted person, and prayed for the appointment of a guardian *ad litem* and a conservator for him, and for partition.

In the preparation of this bill appellee was assisted by Miss Miller. He made no examination of abstracts of title to the various pieces of real estate included in the bill, and had no memorandum brought down showing such title prior to the filing of the bill. No answer was filed to that bill and it was never set down for trial. It was dismissed March 29, 1909, with leave to withdraw it from the files.

The above proceedings were all that were taken relating to the person and property of John Bross Lloyd except a bill which appellee prepared and filed having for its object the setting aside of a conveyance in trust by John Bross Lloyd of all his property to his own lawyer Sprout, and the procuring of service of summons on Sprout. This was done within one day after appellee learned that such a conveyance had been made. No step was thereafter taken in that case except procuring of an order of dismissal.

Appellee testified, "We were all suspicious of Sprout. We felt there was a conspiracy on the part of Sprout and the McGraw woman to get John B's property."

On January 4, 1909, the supplemental bill was filed in the will case with the design to protect John Bross Lloyd and his property from the supposed conspiracy of Sprout and Mrs. McGraw. It had been agreed that

the supplemental bill should be suppressed to enable those who were looking after the Boston end of the matter to watch the McGraw house in order to obtain evidence when service by copy of the bill should be had. It was not suppressed, and John B. got notice that it had been filed before service was had upon him. By a deed dated January 13, 1909, he conveyed all his property in trust to Sprout and one James B. Flint. According to Sprout's statement, it was because of the filing of the supplemental bill that he was enabled to persuade John to put his property into Sprout's hands. By the terms of his instrument John conveyed to Sprout and Flint substantially all the property he owned, including his interest in the William Bross estate, in trust to pay all the grantor's existing indebtedness which should be acknowledged in writing to the trustees, to hold and manage the property, sell and dispose of the real estate and personal property, except the interest of John B. in the capital stock of the Chicago Tribune company, and re-invest the proceeds in other securities, to pay over to the grantor quarterly or as often as practicable the whole of the net income, and also to pay to him at any time during the continuance of the trust, if in the judgment of the trustees it seemed wise to do so, a sum not exceeding $35,000 out of the principal to enable him to engage in business; and, in case of his death, before the expiration of five years, to convert the real estate into cash, and after deducting the costs and expenses of the trust and the compensation of the trustee to pay the cash and the cash received from the sale of the remaining property to his executors or administrator. The trust was to terminate at the expiration of five years from its date or at the death of the grantor, if such death occurred earlier. The trustees were required to give bonds in the sum of $500,000.

As far as the record discloses the trustees under the above deed were in possession of all John Bross

Lloyd's property at the close of appellee's services by the consent and upon the advice of appellee, the trustees having successfully insisted that they should receive the share of the William Bross estate as such trustees, and not as guardians appointed by the Massachusetts court.

On January 19, 1909, Sprout came to Chicago and engaged counsel, and at a conference of the several attorneys in the will suit with Judge Carpenter of the Circuit Court, the fact of the execution of the deed of trust became known to appellee and to Miss Miller. Some discussion occurred with reference to the appointment of a receiver, but such appointment was objected to by Sprout, and the interview resulted in no definite conclusion. On the next morning appellee filed a bill in the Circuit Court of Cook County in the name of John B. Lloyd by Henry D. Lloyd as next friend against Sprout and Flint. It set out the making of the trust conveyance and the terms thereof and alleged that the complainant was a distracted person, incapable of entering into a valid agreement; that Sprout and Flint were residents of Massachusetts, and had no property in Illinois; that Sprout was complainant's attorney and had obtained the trust agreement by means of that relation and the distraction of complainant's mind; that the trustees had taken possession of a part of complainant's property and were about to reduce the remaining portion to their possession, and prayed that the trust agreement be declared void, and an account be taken and the money and property be delivered to a receiver to manage and control the same until complainant should cease to be a distracted person, and that a restraining order be issued. This suit was never put at issue nor tried, and appellee never appeared in court in the suit. He filed the bill and obtained service on Sprout. The only order ever entered in the suit was one of dismissal with leave to withdraw the bill from the files.

Subsequently on January 22nd, appellee wrote Powers & Hall that he had become satisfied that no understanding would be satisfactory with Sprout unless it was one that gave Sprout control over the John Bross Lloyd property by transfer to himself or to some person whom he might feel able to control; that Sprout insisted the trust agreement was valid under the laws of Massachusetts, and appellee advised Powers & Hall to be on the lookout for proceedings by Sprout to have a conservator appointed in Massachusetts, and if instituted to delay them until every person interested could be heard.

It further appears that Sprout suggested to Powers & Hall that the matter be settled without litigation by having Sprout or Flint or both appointed guardians of John on the ground that the latter was a spendthrift. Mr. Hall, Henry D. and William B. Lloyd, Miss Miller and appellee had a conference in Chicago February 6, 1909, and appellee's opinion in regard to the proposed arrangement was asked. Appellee advised that inasmuch as Sprout and Flint had been subjected to some suspicion they would probably try to make good if they were appointed guardians, and that they would look after the boy's interests; that they had given bonds for $500,000 as trustees, and would give additional bonds if appointed guardians; that Sprout would have more control over John Bross Lloyd than anyone else; and if he would act honestly he was the best man to handle it; and if the whole matter could be gotten rid of by having guardians appointed on the ground that John Bross Lloyd was a spendthrift and not insane it would leave no stain upon him, and that it was to everybody's interest to settle the matter in that way. Mr. Hall being of the same opinion, it was concluded that he should go back to Boston and make some arrangements of that kind, appellee telling him to make such arrangements as he thought best. Accordingly Sprout and Flint were appointed guardians

on February 15, 1909, by agreement, in Massachusetts. In that proceeding appellee took no part.

A supplemental bill in the will case was prepared by appellee, and filed March 30, 1909, setting up the conveyances to Sprout and Flint and their appointment as guardians, and praying that the property be turned over to them as trustees. The attorneys for Galt, the trustee, insisted that the personalty should be turned over to Sprout and Flint, as guardians, and the realty to John Bross Lloyd. The attorney for Sprout and Flint told appellee Gilbert that he was going to ask a decree that John's interest be turned over to his clients as trustees. Appellee advised him not to, but at the request of the attorney for Sprout and Flint agreed to say nothing in the argument, and the property was finally taken over by Sprout and Flint, as trustees, under the terms of the trust agreement.

The foregoing is a substantial statement of all the matters and proceedings with which appellee had to do under his employment, with the exception of his participation in an adjustment of the fees to be paid to Mr. Rosenthal and Miss Miller, respectively, for services rendered in the will case. The record does not disclose that any great amount of time was consumed in adjusting the fees as between Rosenthal & Hamill on the one part and Miss Miller on the other.

Appellee testified that the questions of law were numerous; that they were: What was the construction of the will? Whether the Probate Court could appoint a conservator for a nonresident: Whether if the statute did not provide for it the Constitution did: The question of practice as to the method of getting John B. Lloyd's condition before the Court: The right of Henry D. Lloyd to use John B's name in commencing suit as next friend.

As a preliminary to the discussion of the questions involved, we here notice some of the contentions on behalf of appellee   It is seriously urged in his be-

half, in many pages of the brief, that a verdict in favor of a lawyer in a suit brought to recover compensation for professional services is no exception to the rule that a verdict will not be set aside whenever there is a contrariety of evidence, and the facts and circumstances by a fair and reasonable intendment will authorize the verdict; and it is argued that no case is cited by appellants, and none can be found where in an action at law tried by a jury the rule has been laid down that the verdict of the jury, although in accordance with the opinion of the witnesses as to the value of the services rendered, may properly be set aside by the appellate court if the judges of that court have a different opinion as to the value of the services from that testified to by the witnesses. Counsel have even gone so far as to say that it is a manifest absurdity that when a suit brought by a lawyer for his fees is tried by a jury on the application of the defendant, and the services are proved and the opinions of witnesses as to the value of those services are taken, and the verdict of the jury corresponds with those opinions the appellate court can disregard the verdict and the evidence and arbitrarily substitute their own opinion for those of the jury and the witnesses.

We dissent from the position and argument thus advanced. The suggestion that the trial was by jury on the application of the defendants has no proper place in the argument. The fact as to which party demanded the jury cannot influence our judgment.

In passing upon decrees based on the findings of chancellors the appellate courts have frequently substituted their own opinions for those of the chancellor and the witnesses. The Supreme Court while holding that opinion evidence must be introduced and considered has expressly declared that in such cases the appellate court is well qualified to form an opinion and to exercise an independent judgment. Metheny v. Bohn, 164 Ill. 495; Lee v. Lomax, 219 *id.* 218.

Such independent judgment has been exercised to the extent of fixing the precise fees to be allowed in many cases. McMannomy v. C. D. & V..R. R. Co., 167 Ill. 497; Blake v. Blake, 70 Ill. 618; Hutchinson v. Hutchinson, 105 Ill. App. 349; Lee v. Lomax, *supra.* No reason is perceived why an appellate court should not be as free to set aside an oppressive verdict in favor of a lawyer against his client as it would any other verdict which is contrary to the manifest weight of the competent evidence. Indeed, the most important considerations which would weigh in restraint of that power in other cases are absent in a case like the one at bar. The reason most frequently given for the reluctance of the courts to disturb verdicts or findings upon trials in open court as being contrary to the weight of the evidence is that the jury or the chancellor had, in addition to what the record shows, the opportunity to observe the witnesses on the stand and to determine what weight should be given to their testimony. In a trial of a suit for lawyers' fees this observation of the witnesses might be important upon the question of what services were in fact rendered, where there is a controversy upon that question, but it can be of little or no importance to a determination of what would be a usual, customary or reasonable fee for a given service. The nature and extent of the service being known, if in the judgment of the reviewing court the fee is grossly out of proportion thereto, and therefore necessarily contrary to the weight of the evidence, the fact that the judges of the appellate court did not see or hear the expert witnesses calls for slight consideration and is of little weight.

Where the finding of the jury is contrary to the weight of the evidence it is the duty of the appellate court to so declare and to set aside the judgment based upon such finding. Ill. Steel Co. v. Kinnare, 93 Ill. App. 83; Love v. McElroy, 118 *id.* 412; I. C. R.

R. Co. v. Cunningham, 102 *id.* 206; Borg v. C. R. I. & P. Ry. Co., 162 Ill. 348, 355.

In Chicago City Ry. Co. v. Mead, 206 Ill. 174, it was said: "A performance of this duty is absolutely essential for the preservation of the rights of citizens and property owners in all those classes of cases where the judgments of the appellate courts are final and conclusive upon all questions of fact." See also Chicago & Erie R. R. Co. v. Meech, 163 Ill. 305.

In many of the cases already cited it is held that in determining whether the fee is grossly disproportionate to the services rendered the court is not bound by the opinions as to the value of the services. In this jurisdiction the verdict of a jury as to the value of attorney's services has never been canonized or made more sacred or infallible than the finding of a chancellor. It is still subject to review by the courts. Counsel for appellee attempt to make a distinction between the verdict of a jury awarding solicitor's fees and the finding of a chancellor, regarding the right and duty of an appellate court to review the verdict or finding. There is no basis in the law for such a distinction.

Another argument is presented on behalf of appellee, based upon the proposition that there cannot be a usual, customary and reasonable charge for professional services when there are wide differences of opinion between lawyers as to the price or value of such services. To this position we cannot assent, for it would amount to a substantial obliteration of the established rule, whenever a lawyer suing for fees can present a diversity of opinion among lawyers as to the value of his services.

It is also contended that appellants are not in a position to complain that some of the plaintiff's expert witnesses heard only a part of appellee's testimony, for the reason that no objection on this ground was made when the witness was examined, and by not

objecting they conceded the witness was competent to express an opinion. It is true that no proper objections were made upon the trial of the case, but the infirmity of the testimony thus given remains for our consideration. Its weight and value are affected thereby.

Passing now to the consideration of the ultimate question of the case, namely, as to whether the verdict and judgment are contrary to the manifest weight of the evidence, we have no hesitation in saying they are.

However formidable the questions presented as testified to by appellee may have appeared to the jury, composed of persons who have never considered such questions, and perhaps never employed an attorney, those questions are known to lawyers and to courts to be the simple and ordinary questions presented to practicing lawyers every day, and adjudicated upon by the courts continually. It is clear that the legal questions involved were not difficult. The purpose to be accomplished, and for which appellee was retained, was the very ordinary matter of endeavoring to secure the protection of a person's estate from his unwise, immature and reckless judgment, and from the supposed conspiracy between the lawyers employed by John Bross Lloyd, in or near Boston, and Mrs. McGraw. The method of procedure and the principles involved in securing the appointment of a conservator of a spendthrift or of a person of unsound mind are not involved in difficulty and are of common and ordinary occurrence. That there were practical difficulties in accomplishing the object sought to be accomplished, under the circumstances, may be conceded.

When we look at what was accomplished by the various legal proceedings instituted by appellee we are convinced that no service was rendered which produced directly, if at all, substantial results or sub-

stantial benefits to the estate of John Bross Lloyd. This must be taken into consideration when considering the magnitude of the verdict and judgment of $40,000 in this case, appellee having been paid $10,000 on account prior to the commencement of this action. It is to be inferred, we think, from the evidence that appellee himself had very little confidence in being able, under the conditions as they existed at the time he was retained, to secure either the appointment of a conservator or of a trustee and the protection by decree of court of the estate of John Bross Lloyd.

Considering the ordinary character of the legal questions presented and the results accomplished we are constrained to hold that the trial court erred in not sustaining the motion for a new trial and setting aside the verdict.

We think the case was submitted to the jury upon a wrong theory, namely, upon the theory that the professional services were so exceptional that it was impossible to prove a usual, customary and reasonable charge in the City of Chicago for the services so rendered.

We see nothing in the case which should take it out of the ordinary class of suits for lawyers' fees, and we think the witnesses should be compelled to answer the usual questions propounded to lawyers upon such issue.   The case is not exceptional in any sense other than that the estate involved was a large one.

In our opinion the witnesses should be confined to giving opinions upon the usual, customary and reasonable charges for like services in the City of Chicago, and should not be allowed to state as they are allowed to state, in this trial what the fair charge for the services should be.

Furthermore, it is clear that the court erred in allowing witnesses to testify as to the fair value of appellee's services who had not heard the whole of the testimony of appellee as to those services; and while

no objection was made to such testimony, and we can conceive of no reason why objections were not made and exceptions preserved, still the testimony is presented to us with the infirmity involved in the fact that the witnesses did not know what the services had been when they were called upon to express an opinion as to the fair value thereof. Some of the other witnesses had no knowledge whatever of the services rendered or claimed for in the suit except by reading the statement prepared by appellee or his counsel. This was not proper testimony, and while its admissibility was not objected to, it presents a radical infirmity which cannot be overlooked in reviewing the case.

The verdict and judgment are excessive and the judgment is accordingly reversed and the case is remanded for a new trial.

*Reversed and remanded.*