[No. 13434. Department One. March 2, 1917.]

W. J. LANGLEY et al., *Appellants*, v. A. J. DEVLIN et al., *Respondents*, A. W. VOWELL et al., *Defendants*.[1]

LIMITATION OF ACTIONS — KNOWLEDGE OF FRAUD — TIME OF DISCOVERY—EVIDENCE—SUFFICIENCY. In an action for relief upon the ground of fraud in concealing the amount received on the sale of mining stock and secretly retaining a one-tenth interest out of the purchase price without accounting to plaintiff therefor, a finding that the action was barred, under Rem. Code; § 159, subd. 4, because not commenced within three years after discovery of the fraud, is not sustained by the evidence, where it was based upon the testimony of a discredited witness to the effect that the plaintiff knew all the time that defendants held stock and had retained the interest at the time of the sale, which was contradicted by all the concomitant circumstances and by the plaintiffs, who testified that defendants represented that their stock was purchased by them and that plaintiffs did not know that such stock was secretly retained at the time of the sale.

WITNESSES—CREDIBILITY. Credibility is not to be accorded to a witness who was willing to make himself a party to the eloignment of a witness and who made unsupported charges against others of the same crime, and worked upon both sides of the case and betrayed the confidence placed in him.

[1]Reported in 163 Pac. 395.

DISMISSAL AND NONSUIT—GROUNDS—SUPPRESSION OF TESTIMONY. An effort to suppress testimony does not warrant the dismissal of an action in disregard of the merits, since a fine for contempt is usually sufficient to compensate an offense against the maxim *"Omnia praesumunter contra spoliatorem."*

EQUITY—DEFENSES—MAXIMS—COMING WITH CLEAN HANDS. In an action to recover an interest in corporate stock, secrètly retained by defendants out of the purchase price on the sale of plaintiff's stock, it is no defense that the plaintiffs and defendants did not deal fairly with third parties who were interested in the sale and that plaintiffs did not make all persons interested in the subject-matter parties to the suit; since the principle that he who comes into equity must come with clean hands does not apply to defeat the enforcement of a contract because a third party was defrauded, where the defendants first invited the fraud, the third party is not complaining but made common cause with the plaintiff, and there is no evil in the subject-matter of the contract.

Appeal from a judgment of the superior court for Spokane county, Huneke, J., entered March 9, 1916, upon findings in favor of the defendants, in an action for equitable relief, tried to the court. Reversed.

*Cannon & Ferris,* for appellants.

*Post, Avery & Higgins, Robertson & Miller,* and *John P. Gray,* for respondents.

CHADWICK, J.—Appellants brought this action to recover their proportionate share of an one-tenth interest in certain coal mining property which respondents, Page and Devlin, had retained and, as it is alleged, fraudulently concealed from plaintiffs and others interested in the property, when they passed the title to the Corbin Coal & Coke Company, the present owner. It is not denied that there was originally a mutuality of interest in the property, but defendants contend that they took an option upon the several interests of their co-owners at a price that was satisfactory to them, and thereafter sold the property in due course of business to Mr. Corbin.

Appellants insist, that the property was sold under the option plan upon the false representation made by respond-

ents to the other parties that Mr. Corbin was interested in the property; that he would pay no more than $125,000 for the property, being $25,000 to each of the appellants and respondents and $25,000 for the other interests; that Mr. Corbin would not deal with any of the several partners other than respondent Page; that, at the time, it was actually understood between Page and Devlin and one Roberts, an employee of Mr. Corbin who had the matter in charge, that Mr. Corbin would take the property at a price in money and a retained interest, aggregating a value greatly in excess of the sum represented as the extreme price he would pay. The money paid to the several partners by Page and Devlin was the money paid by Mr. Corbin to them. The Corbin Coal & Coke Company was organized, and one-tenth of the stock was issued to Page and Devlin.

The case was made up on the issues of fraud and the statute of limitations. After a trial on the merits, the court below found with the appellants, and made findings and conclusions upon the issue of fraudulent concealment. A motion for a new trial was made and allowed by the court upon the theory that others interested would not be bound by any judgment that might be entered. A new trial was ordered with directions to bring in new parties. Disclaimers were obtained from all of the other parties, save one or two who had been witnesses upon the trial. Appellants then began an original proceeding in this court, praying for a writ of certiorari, seeking to compel the entry of a judgment in accordance with the finding of the court. This court held against their contention. *State ex rel. Langley v. Superior Court*, 73 Wash. 110, 131 Pac. 482. It was afterwards held that the testimony taken upon the so-called new trial should be supplemental only to the testimony that had already been taken (*Langley v. Devlin*, 87 Wash. 592, 151 Pac. 1134), so that the trial really proceeded as if the order granting a new trial had been to reopen the case for additional testimony. When the case again came on for hearing, the question

whether appellants knew of the retention of the stock more than three years before the action was begun became the paramount issue. The statute is:

"An action for relief upon the ground of fraud, the cause of action in such case not to be deemed to have accrued until the discovery by the aggrieved party of the facts constituting the fraud." Rem. Code, § 159, subd. 4.

At the conclusion of the trial, the court adhered to its finding that there had been a fraudulent concealment of the fact that the respondent partners had retained an one-tenth interest in fraud of the rights of the appellants, but found, as a fact, that appellants had knowledge of the fraud more than three years before the action was begun. Judgment of dismissal was accordingly entered in favor of respondents.

The case comes to us upon the whole record. For present purposes, the statement of the facts in the case of *Galbraith v. Devlin*, 85 Wash. 482, 148 Pac. 589, is sufficient. We are satisfied the finding of the trial judge in this case (essentially the same facts were found by another trial judge in the *Galbraith* case), that respondents were guilty of a fraud upon those who had mutual interests in the property, is sustained by a preponderance of the testimony. The only issue, then, is whether appellants were barred by the statute of limitations.

Appellants contend that they did not know that respondents had retained a stock interest until about December 20, 1911. The action was begun January 8, 1912. They admit that they knew that Page and Devlin were interested in the property, but insist that Page and Devlin, by conduct and actual representation, fostered the understanding that Mr. Corbin was hard up at the time the sale was made, and that they, having confidence in the property, had put $47,000 back into the property and had become interested as purchasers of the stock. One fact is prominent, that Page and Devlin said nothing to either of the appellants that would suggest an ownership other than as might have been acquired

by purchase, or which could be construed as even an indirect disclosure of the fact that they had retained an one-tenth of the property, although, up to the time this action was begun, the parties met frequently and were on good terms, and at least one of the appellants was interested in other investments with them.

Appellants testify that their first knowledge of the fact came from one J. J. O'Neill, theretofore a friend of all parties, but who admits that, in revenge against Page and Devlin, who he claims had beaten him out of $7,500 in another deal, and to "get even" with them, he went to W. J. Langley and told him that Page and Devlin had defrauded the other partners by secretly retaining an one-tenth interest in the property, and that they had a cause of action against them; that the action should be begun at once, as the company would have a meeting soon and the stock might be put beyond the reach of a judgment. O'Neill now denies that he furnished original information, or told appellants what they did not know, but the fact remains that, immediately after he had suggested a lawsuit, appellants went to a lawyer in Los Angeles, in or in the vicinity of which city the parties all lived, and submitted the facts to him. The attorney told them he thought they had a case, and advised them to go to Spokane to begin their suit. Spokane was the home of the corporation. O'Neill gave W. J. Langley a letter of introduction to Mr. Cannon, then and now a practicing lawyer in Spokane. After a consultation, Mr. Cannon inquired directly of Mr. Corbin or the officers in charge of the company, and finding the fact to be that Devlin and Page had retained an one-tenth interest, began suit without further delay.

After the motion for a new trial had been granted and pending the second hearing, O'Neill fell out with appellants because, as he contends, they had not given him, or because they refused to sign an agreement to give him, twenty shares of the stock they hoped to recover. In the meantime, and

before the writing of a letter to W. J. Langley charging him with refusing to abide his contract, Page and Devlin paid O'Neill the $7,500 which they had theretofore repudiated. Moved, apparently, by the double motive of a new love for Page and Devlin and a newly hatched hatred for appellants, O'Neill seems to have given way to his admitted disposition to "get even" with appellants and became a partisan and a witness for the respondents. The court below rejected his oral testimony, but did give credence to the letter which he had written to W. J. Langley wherein he complained that he, Langley, was not playing fair, in that he had not delivered, or agreed in writing to deliver, twenty shares of the stock to be recovered as before mentioned, in which letter he said:

"Now that you have won you think all danger is over for any of the methods to come out in which you used in order to win, you think you will stand me off. Well, if your word is any good, I will test it. Does it ever present itself to you how you and your brother used my name in the deal, stating I was the first one who ever gave you the evidence and blamed everything on me, when I can swear that you knew all about it before, but that doesn't matter now."

As we read this letter, it adds nothing to the story of O'Neill. It rather detracts from it. It is not the declaration of a dispassionate, disinterested man. It is self-serving. It is more likely that it is the resource of an admittedly revengeful man. He knew, when he wrote the letter, that one of the defenses was that the action had not been brought in time. The paragraph relied on and accepted by the court stands out boldly as an invitation to buy his peace, with the assurance that, if it were bought, he would not carry his wares (which he afterwards did) to the respondents, he knowing that the merit of the case had been decided by the superior judge against respondents, and that their last chance was the statute of limitations. The letter can have no other meaning, for, on the same day, O'Neill wrote Mr. Cannon, attorney for appellants, complaining that W. J.

Langley was not keeping his agreement, and asking him to "look out for . . . [his] interest in this matter." If appellants did not win, he would have no interest. The only inference to be drawn from his letters is that, if his interests were looked out for, all would be well. It would still be possible for appellants to prevail. If he were not so assured, then "look out." The whole correspondence shows a willingness on the part of O'Neill to conceal the "truth" as he now asserts it to be, the light of which did not dawn upon him until respondents had offered to pay, or had actually paid him, $7,500 which they had formerly refused to pay, and which, so far as the record shows, he had not sought to recover by resort to any legal proceeding. The experience of the ages sustains the legal conclusion that, where the truth is made to depend upon the pecuniary interest of a witness who has no interest in the subject-matter of the suit, his utterances wear a cloak of suspicion, and they should not be accepted unless the taint is removed by the testimony of credible witnesses or by circumstances that cannot be denied.

Another witness, Hughes, testifies that appellants knew all the time that respondents had retained an interest. Of this witness, the trial judge says:

"I was not strongly impressed by the testimony of Hughes. Not that I do not believe him credible, but the character of the conversation he testified to was such that it would not be right to plaintiffs to attach too great weight to it. I haven't his testimony before me, and cannot detail what he said, but I have a distinct impression of the atmosphere (if I may so call it) left by his appearance upon the stand which was that too great weight should not be given his testimony that plaintiffs knew that defendants had retained stock."

While friendly, appellants had no business relations or interests with this witness, yet, according to his testimony, conveniently in season and out of season, they found frequent occasion to tell him—he was, so far as we can see, equally friendly to the respondents—that their case depended upon

the concealment of a fact. His testimony is so incredible and improbable, and the "atmosphere" is so clearly carried into the printed page, that we have no hesitancy in following the trial judge. To believe him we would have to say that appellants were fools. This, counsel for respondents do not assert.

The decision of the trial judge is made to rest entirely upon the testimony of a witness, Hayes. Of him and his testimony, the court says:

"Hayes' testimony is in the form of a deposition. Hayes appears to be the one man whom plaintiffs feared. They evidently knew that he had possession of facts that would damage them if they were known. I do not see how the telegrams, letters and manifest solicitude of plaintiffs and their counsel and of O'Neill can mean anything else than that they feared that he might tell what he knew. His testimony is in no wise impeached. It stands here as that of a credible witness. He testifies to a friendship of long standing between himself and W. J. Langley, and to a close, daily, and intimate relationship between them and their families in the summer of either 1907 or 1908 in California. He had bought forty shares of the coal stock from defendants in 1907. He had known Langley years before in the Coeur d'Alenes. Most naturally, they discussed the coal property, and Hayes said they did daily and at length. He testifies that W. J. Langley knew all along that the defendants had stock. As against such evidence, the denials of plaintiffs do not preponderate."

It seems to us that Hayes, like Hughes, "doth protest too much." But, since the trial judge has rested his decision upon his testimony, it is only fair to court and counsel that we should explain why we cannot subscribe to his conclusion. The trial judge frankly states that he accepted Hayes' testimony because he was "the one man whom plaintiffs feared," and because: "They evidently knew that he had possession of facts that would damage them if they were known." His holding is based upon the assumption that Hayes might tell what he afterwards told upon the witness stand, that appellants knew Page and Devlin had retained an interest in the

Corbin Coal & Coke Company long before the action was begun. By reference to "telegrams and letters," the court inferentially charges that appellants and their attorney, Mr. Cannon, attempted, through the aid and connivance of O'Neill, to make way with the witness at a time when respondents and their attorney were about to take his deposition at Los Angeles.

The court's conclusion is wrong for two reasons: Hayes testifies that W. J. Langley knew all along that defendants had stock. This is not denied by appellants. Indeed, their case is, in a way, predicated upon the fact that they knew all along that respondents had stock in the company. Evidence tending to show a stock holding in no way sustains the essential fact that appellants knew that respondents had retained an one-tenth interest. W. J. Langley testifies that, long before Hayes became a figure in this piece of litigation, Page and Devlin, one or both, told him that Mr. Corbin was hard up when he bought the mine, and to help him (Corbin) out they had put back $47,000; that he, Langley, talked to them about buying some of the stock, and they said it could not be obtained for "love or money." The mine, by that time, had come to be of great promise. The real issue is whether appellants knew that respondents, when they took an option, did so on their own account, or intending to retain an interest when they conveyed to Mr. Corbin.

The charge, openly made by counsel, that appellants and their attorney endeavored to put Hayes beyond the reach of respondents so that his testimony could not be taken brings us to the second reason for rejecting the court's holding. When considered in the light of all the facts and the explanations of the parties, the correspondence will as readily bear an interpretation in favor of honesty as of dishonesty. Respondents were in no way interrupted in their purpose to see and talk with Hayes, and to take his deposition if they wanted it, by any act of appellants. Up to the time of O'Neill's defection, the thing that appellants relied on, so far

as Hayes was concerned, was that they understood that Hayes had bought stock of Page and Devlin, and that they had told him not to say anything about it.

The telegram, upon which the charge that appellants sought to make way with Hayes is based, is:

"Case almost tried and then continued to take deposition of Hayes in your city. Meet Hayes and fix things up until Billy gets there."

That this telegram must be construed in the light of the statement of counsel as to what they expected to prove by him (hereinafter noted) is made certain by reference to a letter written to O'Neill the next day by Mr. Cannon in which he says:

". . . Keep in mind seeing Hayes, after Langley reaches you, these points. Hayes was told not to mention the fact that he had his stock to anyone, perhaps because it might become assessable if the transfer was made upon the books of the Corbin Coal & Coke Company. I cannot see how Hayes can hurt us much, but I don't believe he will hurt us at all if he is carefully handled. Langley will explain the situation to you fully. Kindest regards."

Counsel for respondents seem to have selected the circumstance that Hayes went to Riverside, California, with O'Neill after he had been informed by wire that counsel for respondents was going to Los Angeles to take his deposition, as the primal point in their defense of the decree. Upon O'Neill's bare statement, unsupported and disputed by the events transpiring at the time, they assume that appellants and their counsel attempted to get Hayes out of the way so his testimony could not be taken, at a time when counsel for respondents was in California with an open commission to take his testimony. They cite apt authority to sustain their contention that one who would obstruct justice must bear the burden of adverse presumptions. With this principle, we have no quarrel. But before the presumption follows, the fact must be established. On the one hand, we have O'Neill's testimony. He is thoroughly discredited as a witness. On the other hand,

we have the fact that Hayes makes no contention that he was asked to get out of the way. He was in no sense concealed. He was moving at his own volition. Furthermore it is explained that Hayes was given to the excessive use of intoxicating liquors and periodical sprees; that the purpose of the correspondence was to keep him sober so that he could tell the truth as counsel for appellants understood it to be, and no more than the truth, when sworn as a witness. That Hayes would swear to the fact that appellants knew that respondents had retained one-tenth of the property was not, up to that time, suggested by any one.

O'Neill, following the admitted flagitious workings of his mind, says that he construed the telegram as notice to get Hayes out of the way. When Langley arrived, O'Neill reported that neither he nor a detective (Hughes) had been able to locate Hayes. Within an hour, Hayes came to Langley's house of his own accord. Langley says, and he is borne out by Hayes, that Hayes said he was going to Riverside to recover a disabled automobile which he had left at Riverside for repair. O'Neill says he went along to keep track of Hayes and keep him out of the way. If he did, he failed utterly, for Mr. Devlin had no trouble in locating him. Hayes maintained a home. Devlin telephoned him at Riverside about seven o'clock the next morning. He told Hayes that his attorney was at Los Angeles and they wanted his deposition. Hayes replied that he would return at once, which he did, driving his own car, which had been repaired. He met Langley in Los Angeles. They rode together to Santa Monica, where both he and Langley lived, and where Devlin, Page and one of their attorneys were waiting for Hayes.

Counsel and respondents spent a part of an afternoon and a whole evening in the company of Hayes. His deposition was not taken. When the case was on for trial—the first trial—and about to close, counsel said:

"Also we desire to take the deposition of Mr. & Mrs. J. J. Hayes who are down there, Mr. Hayes being one of the

parties that is fully familiar with this business and related in
interest with the parties. Mr. Cannon: Now, if the court
please, you see we are opening the case again. Mr. Robert-
son: I am willing to conform to your request. Mr. Cannon:
Now, let us look at it. Counsel wants four witnesses to go
on—— Mr. Robertson: I stated if you are going down
there, I don't care who else that you have down there. Mr.
Hayes was to be [here] there. We requested him to come,
and he was taken sick. Mr. Cannon: Well, tell us what his
testimony is. Mr. Robertson: Well, his testimony that he
was one of the parties interested in this 40 shares of stock,
and that he has discussed the matter time and time again
with W. J. Langley, and Mr. Langley knew that he got that
interest from Mr. Devlin, and he has known that I think since
1906, along in there—since 1907, and talked the matter over
from time to time. Mr. Cannon: I am afraid we will try this
case over again. Mr. Robertson: That is the only additional
deposition I want."

Counsel had previously said:

"I don't know whether it is due to me to make a statement,
but I think probably I should do so. I went to California
and Mrs. Hayes was too ill to be consulted at all. Mr. Hayes
was out when I got there, in a different part of the state with
Mr. O'Neill, the party who has been mentioned in this testi-
mony. I was unable to talk with him over this case until
shortly before the deposition was taken, and he has stated
that he was friends of both parties, and upon consideration
there I concluded that I would not take his testimony, the
full scope of which he never gave me."

We have no reason to disbelieve counsel. Hayes is, there-
fore, put in one of two positions equally discreditable to him.
He testifies several times over that he had told counsel all
that he now swears to at the time he met counsel and respond-
ents in California, and that he did not want to give his depo-
sition because he was friendly to both sides. He says he told
Devlin in Spokane, after the suit was started and "before
they went into court," that at least "Billy Langley knew that
they (respondents) had retained an interest." We do not
believe Hayes when he says he told counsel in California that

the Langleys knew all the time that respondents had retained an interest when the control of the property was made over to Corbin, or that he told Devlin in Spokane as early as February, 1912. If he had done so, counsel would not have made the statement to the court that he did. There would have been no occasion for it. Such testimony was vital, if obtainable, and we have no doubt that his testimony would have been compelled, or that he would have been subpoenaed to attend the first trial while in the jurisdiction of our courts.

We find nothing in the record other than Hayes' present statement to sustain the suggestion that the Langleys had often said to Hayes that they knew long years ago that respondents had retained an interest. It is contradicted by every concomitant circumstance in the case. The contention that appellants and their counsel attempted to get Hayes out of the way makes its first appearance in this case after O'Neill had been won over to the other side because of what he conceived to be ill treatment. His disclosure of what he now says is the truth, notwithstanding his former declaration to the contrary, was not made until after the court had practically decided the case upon its merits against the contentions of respondents. The finding that Hayes was the one man whom appellants seemed to fear rests entirely on the statement of O'Neill that he endeavored to suppress the testimony of Hayes, and upon Hayes' subsequent declaration that appellants knew of the fraud. Hayes explains his position, saying: "I did not want to interfere in this affair until I happened to come here [Spokane] on other business." He also accounts for changing his mind:

"A. I will tell you why. I had to come to Spokane here, there is a suit pending against me here which is a mistake. I had paid it. I had brought up the evidence with me and had a letter with me, a receipt with me, and the suit is now being dismissed, and while I was up here I had a talk with Mr. Devlin and Mr. Robertson, and another reason I decided to give my testimony is I felt as though the Langley boys had not been doing the right thing in the case from the con-

versations I had had in the past, and while I was here they asked me to make it and I said, Yes."　　. ·

We have weighed the testimony carefully. With the testimony of O'Neill and Hughes rejected, the decree must rest, if permitted to stand, upon the testimony—or rather not upon the whole testimony, but upon one assertion of Hayes —that appellants knew of the retention of a stock interest by respondents. The assertion does not square with the facts or probabilities as disclosed by other witnesses or by Hayes himself. It comes late. His delay is but carelessly accounted for. His reason for throwing over his friendship for both sides in favor of the one does not bear the earmarks of truth, especially so when he admits that, just before he gave his testimony, a Mr. Roberts, the agent who made the deal in Mr. Corbin's behalf, and who was a participant in the division of the reserved interest, made his credit good to the extent of several hundred dollars at a local bank in Spokane. He was in financial distress at the time.

There is nothing in the record that would warrant an overturning of the equities of the case upon the assumption that appellants "feared" Hayes. W. J. Langley frequently loaned him money, which he repaid as a debt. Within six months before Hayes gave his testimony, he says he asked W. J. Langley, in Los Angeles, for a loan of five dollars, and he refused it, "and I was broke." It would seem, if Langley feared this man, he would not have taken the chance of incurring his displeasure at the risk of a loss so slight as five dollars. "Testimony fairly explained away and contradicted by circumstances in evidence is not conclusive upon court or jury." Moore, Facts, § 92.

See, also, *Gosline v. Dryfoos*, 45 Wash. 396, 88 Pac. 634; *Keene v. Behan*, 40 Wash. 505, 82 Pac. 884; *Coey v. Darknell*, 25 Wash. 518, 65 Pac. 760.

But, granting that appellants and counsel were afraid of Hayes, there is as much or more in the record to sustain a

finding that the fear was that Hayes would be unduly influenced by respondents as that he would testify as he did. Hayes was habitually hard up, and was in the habit of going on occasional sprees. Nothing is offered that suggests that he is a fixed or dependable character. The elusiveness of O'Neill, which is now so clearly proven, is enough to warrant a belief that respondents were quite able to take care of themselves in dealing with witnesses.

Mr. O'Neill has not only been content to be upon both sides of this case, but in his zeal he is willing to make himself a party to the eloignment of a witness, a crime against the administration of justice, and to sustain his position he imposes, by his unsupported testimony, the same crime upon at least one of the appellants, and upon one of their attorneys. "These hard imputations, being unsupported by facts, do not add to the credibility of the witness who makes them." *The Bee*, 1 Ware (U. S.) 336; Id., Fed. Cas. No. 1,219. So where a witness works industriously on one side of a cause and then turns up on the other side and betrays the confidence reposed in him, he is not to be believed. Moore, Facts, § 1006; *Blake v. Blake*, 70 Ill. 618.

But if it were true that one of the appellants endeavored to suppress testimony, we doubt whether it should ever warrant a judgment of dismissal in disregard of the merits. A substantial fine for contempt is usually held to be sufficient to compensate an offense against the maxim *"Omnia praesumunter contra spoliatorem,"* and the offended dignity of the court. This should be so in every case where it is uncertain. whether the attempt, if made at all, took other form than mere persuasion, and the testimony is forthcoming before the court is called upon to pass judgment on the merits.

Much of the briefs and arguments are taken up with a discussion of the doctrine of clean hands, and the fact that appellants joined respondents in a suppression of the truth in their dealings with Galbraith, and that they did not make

others who had an interest in the subject-matter parties to the suit.  But we are content to follow the conclusion of the trial judge, that is, that appellants may recover if not barred by the statute of limitations.  However, it is not out of place to say that the doctrine comprehended in the maxims *"Ex turpi causa non oritur actio"* and *"he who comes into equity must come with clean hands"* are not to be applied under the facts of this case.  There was no evil in the subject-matter of the contract which the parties made.  If evil followed the execution of the contract, the respondents were the first actors.

Under the doctrine relied on, relief is denied where a right arises in inequity, as in the case of the highwayman, illustrated by Lord Kenyon and referred to in most of the books and in many cases, that is to say, where the subject-matter of the contract has no legal status.  Or where a decree would operate to place the title to property which, in equity, belongs to another in the hands of a wrongdoer, the most frequent illustration of the latter being where one executes a deed with secret trust in fraud of his creditors.

We have here a different case.  Respondents say, although we may have acted in fraud of your rights, you cannot recover because you were a party to a fraud which we practiced upon another.  If appellants were guilty of a fraud upon a co-worker, the fraud was invited by the respondents.  The third party is not complaining.  On the contrary, he has made common cause with the appellants, and to hold that a court of equity cannot search a contract that is neither proscribed nor contrary to good morals, because of a fraud affecting a third party or a collateral right, would lead to the absurd consequence that a defendant in a suit would take a decree equivalent in its legal force to affirmative relief under the plea of corrupt participation.

Respondents were put in no worse position by the alleged fraudulent acts of the appellants.  On the contrary, they profited by them.  The maxims "He who comes into equity must come with clean hands," or after suit brought, "He

who seeks equity, must do equity," mean no more than that he who has defrauded his adversary to his injury in the subject-matter of the action will not be heard to assert a right in equity. Respondents have not been misled or over-reached. By no act of appellants have they been worsted. In the application of principles it is important that we do not put one principle at war with another. While courts will not, as a rule, measure equities between wrongdoers, they are quite as careful to deny to any man the advantage of his own wrong. In passing upon this phase of the case, the court below resorted to an illustration, unique, but having the merit of clarity and simplicity:

"The subject matter of this litigation is the fund received from Mr. Corbin for the sale of these coal lands. Now in the first distribution of that fund, plaintiffs have confessedly soiled their hands and it seemed to me that that ought to be sufficient to invoke the maxim. But further reflection convinces me that the rule does not go that far. I have tried to visualize the soiling of hands and the homely picture may help to grasp the situation. Let us suppose that the fund, cash and stock, was placed by Mr. Corbin in a vessel and handed to the defendants. The color of the fund we will say is black. Before defendants take the vessel to plaintiffs, they put their hands into it and extract the stock. Their hands are stained black. The color of the fund remaining, the cash, has changed from black to red. Defendants now take the vessel to plaintiffs and say: 'Here is the whole fund, let us extract some of it before taking it to Galbraith.' Accordingly, they dip their hands into the vessel and take out cash, leaving but $75,000. Their hands are stained red, and the color of the fund again changes to transparent crystal and it is distributed. The maxim will prevent any party whose hands are soiled from litigating with respect to the fund bearing the color of his hand stains and no other. In this case, the fund is the stock and its color is black; plaintiffs had no opportunity to immerse their hands into the vessel when it was black, hence they are not black. The fact that they are stained red—by another fund, another transaction—will not prevent them from litigating now over this fund."

To apply the maxims relied on to the facts in this case would but pervert them; to say that if any man hath done a wrong to another he shall not be heard in any case, either at law or in equity.

We shall not follow counsel in their criminations and re-criminations. They lead only to collateral questions and tend to cloud the real issue. Granting equal merit in all the charges made, as, indeed, there has been equal zest in making them, it would seem to follow, if the equities are equal, that the rights of the parties should be measured by the rules of law. The parties should not be heard in equity where the merit of the case is clear and the charge made against the complaining party is collateral to the main issue.

In conclusion, and without violating our holdings that the statute of limitations is not an unconscionable defense, we hold that it may be, in the light of all attending facts, a technical one, and unless the bar is established by testimony having the earmarks of truth in sufficient degree to appeal to a court of conscience, it should never be resorted to to defeat positive equities.

Reversed, and remanded with instructions to enter a decree in favor of the appellants.

ELLIS, C. J., MOUNT, FULLERTON, and MORRIS, JJ., concur.