## JUDSON v. BUCKLEY.

No. 352.

Circuit Court of Appeals, Second Circuit.

Aug. 18, 1942.

Writ of Certiorari Denied Nov. 9, 1942.

See —— U.S. ——, 63 S.Ct. 161, 87 L.Ed. ——.

See, also, 31 F.Supp. 246.

Debevoise, Stevenson, Plimpton & Page, of New York City (E. W. Debevoise, R. G. Page, and D. F. McGlinchey, all of New York City, of counsel), for complainant.

Prentice, Collins & Dwight, of New York City (Thomas F. Chawke, of Detroit, Mich., and Ezra P. Prentice, James F. Collins, and Nathaniel W. Gold, all of New York City, of counsel), for defendant. ·

Chester T. Lane, Gen. Counsel, John F. Davis, Asst. Gen. Counsel, Milton V. Freeman, Asst. to the Gen. Counsel, and Louis Loss, all of Philadelphia, Pa., Atty., for Securities and Exchange Commission, Amicus Curiae.

Before AUGUSTUS N. HAND, CLARK and FRANK, Circuit Judges.

AUGUSTUS N. HAND, Circuit Judge.

This is a suit by Ross W. Judson against Paul O. Buckley, in which the former asks that he be adjudged the owner of 18,000 shares of stock of the Bath Iron Works Corporation registered in the name of Buckley, and that the latter account for all of his various dealings as agent of the complainant. Buckley set up various denials and special defenses and interposed numerous counterclaims. The litigation was referred to Honorable Frederick E. Crane as special master, who made his report to the District Court. Thereafter judgment was entered on February 19, 1942, holding Buckley liable to Judson in the sum of $159,829.71, less certain offsets, with interest from August 23, 1938, the date of bringing suit, resulting in a net recovery (including interest) of $191,622.95. Both parties appeal from the judgment. We hold that it must be modified in the respects hereinafter mentioned.

Judson is a retired industrialist who, in the early part of 1930, proposed to use his capital of between four and five million dollars as an investor and speculator. Buckley met Judson in May, 1930, and represented himself as experienced in matters relating to finance and securities, and the two men soon became engaged in various financial and personal transactions. In connection with an exchange of stock Judson paid Buckley $1500 for services. He also offered to pay him in connection with the settlement of a controversy with his wife. But Buckley stated that these latter services should be considered friendly acts for which no compensation was desired.

Shortly thereafter Buckley suggested that mutually profitable investments could be made if Judson would permit him to manage brokerage accounts for Judson under an arrangement whereby Buckley would receive 25% of the trading profits in return for his management services. Judson acceded to this proposal and the two agreed that an accounting would be had when there were sufficient profits, and that there would be deducted from Buckley's 25% any sums owing from him to Judson. Brokerage accounts belonging to Judson were opened with various firms and operated under the management of Buckley. There were never any net profits from the operation of these accounts; instead, when, Judson terminated Buckley's authority in the latter part of 1937, the trading had resulted in a net loss of about $600,000, for which, however, no claim is made.

In December, 1930, the government asserted against Judson claims for income tax deficiencies amounting to approximately $900,000. Judson retained various attorneys and accountants to represent him and discussed with Buckley practically all phases of the matter, including the hiring and discharging of counsel and their fees. Settlement of these claims was arranged in November, 1935, and Judson paid the last instalment of the deficiencies about October 26, 1938, a few days after this suit was instituted.

Prior to 1935, the government had placed a lien upon Judson's assets to secure the payment of such sum as might be due from him and nearly all of Judson's securities were held by the Collector of Internal · Revenue at Detroit under 'this lien. In January, 1935, Judson proposed to purchase notes and 2,500 shares of common stock and 1,000 shares of preferred stock of Bath Iron Works, held by the receiver of the Harriman National Bank as collateral security to an indebtedness of about $300,- 000. He sought to use the Bath stock as a basis for borrowing money to complete the purchase from the receiver and to obtain the release of his securities in the possession of the Collector. In order to obtain a loan to pay the receiver, he arranged with the Collector to release the Judson securities in the latter's possession and accept· in substitution therefor the Bath stock, together with deeds to Judson's

real estate. Judson acquired the notes and Bath stock in September, 1935, through negotiations carried on by Buckley, by paying $135,000 therefor. The notes and the Bath stock were delivered to the Collector and held under his lien as security for payment of the sum which might be determined to be due to the government from Judson.

In January, 1936, Judson, as owner of the notes he had purchased from the receiver of the Harriman National Bank, foreclosed his lien on the 2,750 shares of common stock and 1,000 shares of preferred stock of Bath Iron Works and thereby acquired title to the stock which, however, continued to be held by the Collector under the government lien. On or about March 23, 1936, Judson bought the interest of one Harbeck in the deal for about $10,000 and agreed with Buckley that in return for his services in reselling the stock and for the promise to pay one-fourth of the costs and the expenses, any sales of the stock were to be made 25% for the account of Buckley and 75% for the account of Judson. Judson was to be under no expense for selling the stock and for carrying on negotiations with underwriters. Buckley enlisted the aid of Allen Melhado, a partner in E. A. Pierce & Co., to carry on negotiations and to formulate a plan for the marketing of the stock. Through the negotiations of Buckley and Melhado, a recapitalization of the Bath Iron Works was proposed. Judson and Buckley were entitled to 178,500 shares of common stock of the company as recapitalized, of which certificates for 133,837½ shares were placed in Judson's name and 44,612½ shares in Buckley's name and deposited with the Collector of Internal Revenue, subject to his lien, in place of the old stock. Hemphill, Noyes & Co. were to underwrite the purchase of 50,000 shares of new stock to be issued by the Company and to market an additional 144,000 shares derived from the stockholders. Buckley had obtained options from Judson and a group headed by Newell, the president of the Bath company, covering the 144,000 shares, whereby he was given the option to purchase their stock at $6 a share. He assigned these options to Hemphill, Noyes & Co. to carry out the marketing. The latter were to pay $10 a share for the 50,000 shares and $6 a share for the 144,000 shares covered by the options. The 144,000 shares were to consist of 72,000 shares furnished to Buckley by Judson, and 72,000 shares furnished to Buckley by the group headed by Newell. The price to the public was to be $12 a share. Of the 144,000 shares, 25,000 were to be sold for the account of Hemphill, Noyes & Co. The six-dollar underwriting profit on the remaining 119,000 shares was to be divided $1 bankers' commissions, 42¢ to Allen Melhado, $2.29 to the underwriters, and $2.29 to Buckley.

The agreement between Buckley and Judson for the sale of the Bath Iron Works stock contemplated that each block of stock sold should be drawn from their respective holdings in a 75%-25% proportion. This was clearly necessary to prevent one party from appropriating the most advantageous sales to himself. When, therefore, the syndicate headed by Hemphill, Noyes & Co. was formed, the respective contributions of Judson and Buckley would in the ordinary course of their agreement have been 54,000 and 18,000 shares. But before the Registration Statement based on the above underwriting agreement had been filed with the Securities and Exchange Commission Buckley told Judson that he was to be the syndicate manager, and that as he held options on the 144,000 shares he could not sell any of his stock "because under the laws of the S. E. C. you cannot do that." He further said that what they would have to do was to sell 18,000 shares of Judson's stock to Hemphill, Noyes for Buckley's account—this being 25% of the 72,000 shares of Judson's stock on which Buckley had held an option. It was found as a fact that the 18,000 shares were to be sold for Buckley, or for his account, and that the remaining 54,000 shares were to be sold for Judson. While it is obvious that as a matter of conveyancing technique Buckley could not act as both optioner and optionee, counsel have pointed to no rules of the S. E. C. which would have prevented Buckley from selling, 18,000 of his own shares after proper disclosure, and acting as optionee with respect to only 126,000 of the 144,000 shares, and we know of no such rule. The registration statement then filed with the S. E. C. stated that Buckley owned 44,612½ shares, none of which were to be sold; that Buckley had an option on 72,000 shares from Judson at $6 a share; that stockholders, including Buckley, had agreed not to sell any of their stock except that offered in the option agreement during the life of the option agreement; that the selling

stockholders, including Judson, were to get $6 a share—in other words, that Judson was to get $432,000 for his 72,000 shares. It is said that if 18,000 shares of stock, though derived from Judson, were to be sold for account of Buckley, the statement was false; that if Judson was selling only 54,000 shares, the statement that Buckley had an option on 72,000 shares from Judson was false; that if 18,000 shares were to be sold for account of Buckley, the statement that stockholders had agreed not to sell any of their stock except that offered in the option agreement was false; that if Judson was to receive a share of the syndicate profits in addition to the $6 a share represented to be the selling price of his stock in the registration statement, that statement was also false. Because of these false statements the court below refused to enforce the agreement that Buckley made with Judson to replace the 18,000 shares of stock standing in the name of Judson which had been sold for Buckley's account. They likewise refused to require Buckley to account for the syndicate profits traceable to Judson's stock which Buckley and Judson had agreed in the fall of 1936 to divide equally, rather than 25-75, because of Buckley's unexpectedly heavy expenses in arranging the underwriting.

■ The prospectus became effective November 4, 1936. In January of 1937, Judson discovered that in consequence of Buckley's plan of selling the 72,000 shares standing in Judson's name the latter would be liable for income taxes on his own 54,000 shares and on Buckley's 18,000 shares as well. Judson thereupon sought to persuade Buckley to take down some of his own stock, but Buckley then represented that this would be impossible under the S. E. C. statement he had already filed. We cannot see why the S. E. C. statement might not have been amended. It does appear that at this point Judson realized that the registration statement did not properly state the number of shares he and Buckley were selling and he took no steps to have it amended. But it seems plain that he could realize no advantage from his inaction other than the saving of some time and trouble, nor can we see that the errors in the statement could mislead prospective purchasers as to the value of the stock or really prejudice them in any way. Disclosure that Judson was to share in the underwriting profits would, if anything, have given the impression that the shares

were more valuable than one might have supposed from the $6 sale price and, while disclosure that Buckley was selling some stock might have been of some slight significance as indicating the attitude of a substantial minority stockholder toward the company, would have added very little to the disclosures that the company's principal officers were disposing of part of their holdings and that Judson, who was said in the statement to be "associated (with Buckley) in various business enterprises," was selling a large block of his stock. The public offense committed by Judson in failing to cause the registration statement to be amended in these particulars was one of little practical significance. The master and the District Judge each held that Buckley's agreement to replace the 18,000 shares was unenforceable because of the faulty registration statement but it seems to us that to deprive Judson of an accounting under an entirely lawful agreement because of a violation of the Securities Act, 15 U.S.C.A. § 77a et seq., which never caused investors in the stock any harm imposes sanctions that are unnecessary for the public good and were never intended by Congress. Cf. Twin City Co. v. Harding Glass Co., 283 U.S. 353, 356, 51 S.Ct. 476, 75 L.Ed. 1112, 83 A.L.R. 1168.

The Securities and Exchange Commission has filed a brief as Amicus Curiae which sets forth the situation most clearly and helpfully and seeks to have the judgment affirmed as to the disposition of the 18,000 shares and any interest of Judson in the syndicate profits on practically the same grounds adopted by the master and the court below. It calls attention to the importance of truth and accuracy in registration statements and seeks to distinguish the decision of the Supreme Court in A. C. Frost & Co. v. Coeur D'Alene Mines Corp., 312 U.S. 38, 61 S.Ct. 414, 85 L.Ed. 500, in which an underwriter was allowed to recover upon an underwriting agreement for the purchase and sale of stock though the shares had not been registered as required by the Act.

While the accuracy and propriety of the statements Buckley and Judson made may not be defended, it seems necessary to consider the position in which Judson stood before depriving him of his contract right to his due proportion of the stock. It is to be remembered that Buckley was a lawyer of experience upon whom Judson would inevitably rely (and he testified that

he did rely) in such a complex matter as a registration statement. Buckley told Judson that it was necessary to cast the transaction in the form adopted in order to comply with the law. Judson accepted Buckley's plan, yet even as late as January, 1937, he wrote to his tax counsel indicating that he did not understand the necessity for it (Defendant's Exhibit 86).

■ In view of the circumstances of the present case, it seems to us that Judson was in the position of a person having nothing to gain by any errors in the registration statement, and that so far as he had any share in them, he had it because of the guidance of Buckley, who was his agent and confidential adviser. While we may not disagree with the general view of the Commission that the Frost case will not justify a court in enforcing contracts made in violation of the Securities Act where they are calculated to damage the investing public, each case must be judged upon its own special facts, and we think that a sound public policy will not be promoted by depriving a principal of the right to hold his agent accountable in situations like the present.

■ Numerous authorities support the view that a suit for recovery is not barred in cases where: (a) the parties, because of their relationship and conduct are not in pari delicto, Ford v. Harrington, 16 N.Y. 285; Tracy v. Talmadge, 14 N.Y. 162, 67 Am.Dec. 132; Norton v. Blinn, 39 Ohio St. 145, 149; Place v. Hayward, 117 N.Y. 487, 23 N.E. 25; 6 Williston, Contracts, Rev.Ed., § 1789; (b) where any wrong done is a thing of the past, and is collateral to the cause of action asserted and where the relation of the illegality to the relief sought is indirect and remote, Loughran v. Loughran, 292 U.S. 216, 228, 54 S.Ct. 684, 78 L.Ed. 1219; Planters' Bank v. Union Bank, 16 Wall. 483, 499, 21 L.Ed. 473; Brooks v. Martin, 2 Wall. 70, 17 L.Ed. 732; Hanover Nat. Bank v. First Nat. Bank, 8 Cir., 109 F. 421; State v. Capital City Bank, 32 N.M. 369, 257 P. 993; (c) where the res sought to be recovered is held in escrow under what is in effect an order of interpleader so that a refusal to act in favor of the complainant will amount to affirmative action in favor of the other party. Buchhalter v. Rude, 10 Cir., 54 F. 2d 834, modified as to costs 286 U.S. 451, 52 S.Ct. 605, 76 L.Ed. 1221; Commonwealth Finance Corp. v. McHarg, 2 Cir., 282 F. 560; Langley v. Devlin, 95 Wash. 171, 163 P. 395, 4 A.L.R. 32.

Each of these three conditions exists here. Moreover, we do not see that any misstatements were made to the Commission in respect to matters which might mislead investors to their damage.

In view of the foregoing, it seems to us that Judson is entitled to a decree ordering the delivery to him of 18,000 shares of Bath Iron Works stock now standing in the name of Buckley. But in addition to Buckley's objections based on misstatements to the Commission, he resists such an order on the further ground that when Judson demanded this stock in the spring of 1938 it had a readily ascertainable market value and accordingly Judson is entitled only to damages at law for his loss and not to specific performance in equity. Such, in our opinion, is not a correct interpretation of Judson's rights.

It seems to us an inevitable inference from the prior relations between the two men, from the manner of acquiring the stock, and especially from the terms of their agreement to resell it that Judson and Buckley were co-adventurers in this enterprise. Because of fancied dangers of tax complications, it was arranged that the certificates should be registered in their several names in the proportion in which they were to share profits, but it made no difference in respect to the dominant equities whether the stock was held in that way or in their joint names, or in the name of but one of them. In order to carry out the profit-sharing agreement it was practically necessary to sell the shares of stock, from whatever block derived, for the account of each in proportion to his interest in the proceeds. Otherwise, it would have been open to either of these men who, as co-adventurers, owed each other reciprocal obligations to deal in good faith, to take an unconscionable advantage of the other. If, for example, the 72,000 shares Judson sold were treated as entirely his own, it would have been open to Buckley to obtain an unfair advantage by selling at a later date his 18,000 shares on the higher market created by the underwriting. If, on the other hand, the market had fallen and Buckley had sold shares standing in his name at a lower price, he would have suffered the relative disadvantage of losing his share in the larger profits realized on the shares sold in Judson's name. It thus becomes impossible to treat this contract

otherwise than as a joint enterprise if we are to safeguard adequately its profit-sharing clauses. It will be noted that it was Buckley himself who at first required the 72,000 shares to be sold one-fourth for his account, though they all stood in Judson's name.

Doubtless we might hold that a court of equity having obtained jurisdiction because the suit was for an accounting was entitled to proceed to grant a complete remedy. But we prefer to rely upon the plain fact that Judson and Buckley each held legal title to these shares subject to trusts in favor of the other arising from the terms of their joint adventure. In such circumstances, and according to the substantive doctrines of equity, Judson should not be remitted to his remedy at law, but may require Buckley to account for the shares in specie. Krohn v. Williamson, C. C., 62 F. 869, affirmed 6 Cir., 66 F. 655; Johnson v. Brooks, 93 N.Y. 337; 3 Scott, Trusts, 2410.

Moreover, though some sales at ascertainable values took place following Buckley's repudiation of his promise to deliver we cannot infer that 18,000 shares could have been purchased at an ascertainable price. The acquisition of so large a block would probably have required market operations covering a long period of time and what the eventual cost would have been cannot now be determined with anything like the accuracy suggested by quotations of prices on sales which may not have involved blocks of comparable size. When the property itself is in court and readily available for distribution, we ought not to permit a fiduciary to refer his cestui que trust to a remedy so uncertain.

Accordingly, Judson is entitled to a decree requiring Buckley to transfer to him 18,000 shares of stock of the Bath Iron Works now on deposit with the Clerk of the United States District Court for the Southern District of New York. The sum of $108,000 heretofore received by Judson upon the sale for the account of Buckley of 18,000 shares of stock of the Bath Iron Works standing in Judson's name is to be credited against the principal found due to Judson under the judgment herein, after charging against such $108,000 any dividends which Buckley may have received upon the 18,000 shares of stock which he is directed to transfer and for which dividends he is accountable to Judson.

As we have already pointed out Buckley received $2.29 per share on each of the 119,000 shares supplied by the stockholders of the Bath Iron Works. The total sum amounted to $272,510. It seems evident that half of this amounted to an additional sale price for the Judson-Buckley stock and, under the basic agreement, Buckley would be accountable to Judson for 75% of half of $272,510. But because of Buckley's heavy expenses in marketing the stock Judson restricted his own claim to one-half of these underwriting profits and agreed that legitimate expenses might be deducted from the gross underwriting profits in computing the net sum available for division. Judson conceded so much on the witness stand (Rec. 354). While the court below found that Judson was to be under no expense for the marketing of the stock, this meant only that he was to put up no more money in connection with the underwriting; the ultimate sale price was to be determined only after deduction of necessary selling commissions.

Buckley agreed to pay Henry Brout 10% of his underwriting profit in return for Brout's aid as an accountant in marketing the stock. At the instance of Allen Melhado he agreed to pay 60% to Melhado's brother and father. The master found that this total of 70% of the profits was deductible as legitimate expense; and though Buckley seems to have been generous with the common fund, the difficulty involved in marketing the stock of a company that had suffered the financial troubles of the Bath Iron Works is manifest and we cannot hold the master's allowance of the large expenditures clearly erroneous.

Buckley showed Judson a statement for division of the profits along these lines (Complainant's Exhibit 289) and then paid him the 7½% of the underwriting profits which would represent Judson's half of the profits attributable to the 72,000 Buckley-Judson shares sold. While the District Court did not find this in explicit terms, the sum in question or its approximate equivalent, was concededly paid in checks and cash by Buckley to Judson. Since the District Court declined to apply these checks and cash, as Buckley asked, to the indebtedness from Buckley to Judson incurred on the original purchase of the stock, we must infer that the court found that the payments were made on account of syndicate profits. Nothing else seems tenable in view of the correspondence of the sums

paid with the 7½% interest of Judson in the syndicate profits.

Buckley finally paid Brout about $20,000 more than the 10% originally contemplated, so that Judson may have been overpaid. However, we think that Buckley is bound by the account he stated, at least to the extent that he could not charge Judson with further expense without the latter's consent.

Under these circumstances we conclude that the claim of Judson for syndicate profits has been satisfied and must be dismissed. But he appeals from the disallowance of various other items in the accounting between himself and Buckley.

### 200 shares of Capital City Products Stock.

Buckley, with Judson's consent, mingled his own Capital City Products stock with Judson's in the latter's account with Clucas & Co. In respect to this item the only question involved is whether the District Court correctly determined Judson's loss by averaging the selling prices of all the Capital City stock in the account, or whether it should have applied the "first-in, first-out" rule. It seems clear that where by the owners' consent certificates of stock are so commingled that the owners cannot be separately identified the shares are held in common and that the "first-in, first-out" rule should not be applied. The disposition of this item is accordingly affirmed.

### Loss on 100 Shares Alleghany Corporation Stock.

The question involved in this claim was whether Buckley made a proper disclosure to his principal, Judson, of a sale of Buckley's own Alleghany stock into Judson's account at the market price. Buckley testified that Judson knew of the particular transaction (Rec. 844). The evidence was, therefore, sufficient to justify the rejection of the claim.

### 100 Shares Cities Service Stock.

Judson claims that he was entitled to charge Buckley with losses sustained in Judson's account at Clucas & Co. because of the unauthorized sale of Cities Service stock from the "Buckley No. 4" account to Judson's account. The master and the trial court found upon substantial evidence that both accounts belonged to Judson; hence the claim for the loss was rightly rejected.

The court below did charge Buckley with the withdrawal of a sum amounting to $374.80 from the "Buckley No. 4" account which, as we have said, belonged to Judson. The only question was whether Buckley repaid the balance of $374.80 to Judson. Buckley testified that he did repay it, but the District Court did not believe the testimony. The attempt of Buckley's counsel to substantiate the claim of payment by the admission of Judson that the latter received certain cash on account of syndicate profits must certainly fail. Buckley could hardly claim credit for paying a debt to Judson with Judson's own money. The claim was properly allowed to the extent of $374.80.

### Ettinger & Brand Account.

The claim of a loss of $13,497.20 upon this account was rejected by the court below. There was sufficient evidence to justify a finding that Judson never contributed anything to this account and had no interest in it, but on the contrary had an account of his own with the same broker. The claim was properly rejected.

Buckley filed various cross-claims which we dispose of as follows:

### Legal Services.

Buckley has presented a large counterclaim for legal services rendered. These services had to do with assisting in negotiations with the government relative to Judson's income tax deficiencies; with Mrs. Judson relative to a separation settlement; with the Continental Motors Corporation concerning a claim against Judson for misuse by him of its funds while he was its president; with the lessee of a theater in which Judson was interested as a mortgage bondholder; with the receivers of certain closed Detroit banks who were threatening wasteful liquidation of collateral to certain loans to Judson; with officers of the Marmon and Peerless Motor Companies and the Hayes Body Company concerning a possible merger; with one Eugenie Salmon, who filed a suit for personal injuries against Judson; and with yacht brokers over their claim for upkeep of the yacht.

Judson denied that he had ever engaged Buckley as an attorney. While there was testimony to substantiate Buckley's claim that Judson had entrusted some of these essentially legal matters to his care, it does not seem to us that the master and the

court below lacked sufficient evidence to support their finding that these were friendly services rendered by a close financial associate without expectation of pay.

Buckley had himself given up the practice of law. Judson was at all times represented by his regular attorneys, Messrs. Barbour and Desenberg, whose testimony throws doubt on the precise amount of services Buckley rendered in these transactions. Judson paid large fees to J. H. Rosenbaum and Eugene Meacham to represent him in the tax case. Officers of the Peerless, Marmon and Hayes companies and of the trustee-bank under the theater mortgage denied negotiating with Buckley. It appears that in the case of some services rendered by Buckley, Judson paid him promptly, and that there were affirmative understandings that payment would be made. But there was testimony that no claim was ever made for the services now in question until this suit was brought.

Buckley was given authority to trade in Judson's accounts and he was to receive 25% of the profits. This must have been a very valuable relationship from his point of view; and it cannot be thought surprising if he sought to cement it by assisting Judson in some of these matters without any charge. It is also to be borne in mind that Buckley never paid a thing for the Bath Iron Works stock and that through Judson's financial assistance he was allowed to come into that enterprise through which he will receive the means of repaying Judson and obtain a handsome profit.

In view of these circumstances, we are not justified in differing with the finding of the master and the District Court that Judson was under no obligation to pay Buckley for these services because it was not the expectation of the parties that he should do so.

### Loans by Judson to Buckley.

■ Buckley objects to charges against him representing loans by Judson. These items are withdrawals by Buckley from Judson's accounts which Buckley did not satisfactorily explain and which Judson testified were presumptively loans to be repaid from the profits of their market operations. Buckley insists that a total of $26,650 of these checks on Judson's accounts were dated more than six years before the bringing of the present suit and are barred by the statute of limitations.

But Judson and Buckley had mutual accounts which were to be settled only when their business ventures resulted in some profits. Such an event did not occur so far as Buckley was concerned until the marketing of the Bath Iron Works stock. We think the District Court properly overruled the defense of the statute of limitations. Minion v. Warner, 238 N.Y. 413, 144 N.E. 665, 41 A.L.R. 1412.

■ Buckley further argues that Judson admitted in his reply to Buckley's amended answer that certain of the checks treated by the District Court as loans were received by the latter as payments on account of services. While the amended answer was somewhat ambiguous, any ambiguity that existed was clarified by an amendment of the reply to the effect that the $54,320.48, which included the questioned checks, and other moneys paid by Judson to Buckley were loans. The question whether the items were loans or payments for services was fully litigated so that the amendment to conform the pleadings to the proof was entirely proper.

■ The trial court ruled that since Buckley was acting in a fiduciary capacity he was required to render an accounting of any moneys he received from Judson, and to the extent that he failed to do this, he was held liable for the face amount of the checks on the theory that they were loans and advances, as Judson testified. It was argued on behalf of Buckley that a presumption exists that the checks received represented payments of Judson's obligations to him. But such a presumption cannot be invoked to shift the duty of the recipient of payments to explain their nature where there is a fiduciary relationship. Marvin v. Brooks, 94 N.Y. 71; Wootton Land & Fuel Co. v. Ownbey, 8 Cir., 1920, 265 F. 91.

■ The other objections made by Buckley to the sums included in the item of $50,497.66 are directed (a) to a charge of $3,900 representing withdrawals by him from an account with Watling, Lerchen & Hayes (afterwards transferred to Clark & Co.), and (b) to a charge of $8,935.17, representing a withdrawal by Buckley from the Whitehouse & Company account belonging to Judson but standing in the name of Buckley. The objection to the charge of $3,900 is based on the contention that there was an account stated between Judson and Buckley as to their dealings in this partic-

ular account. This is improbable on the evidence, and we shall not disturb the contrary finding of the trial court. The second item of $8,935.17 was rightly allowed to Judson after crediting to Buckley all withdrawals found by the District Court to have been applied for Judson's benefit.

### Cost of Buckley's Interest in Bath Iron Works Stock.

Buckley next objects to the inclusion of his proportion of the items of $18,000.40 paid for registration expenses, and $10,421.50 paid to buy out Harbeck, in the cost of Buckley's one quarter interest in the Bath Iron Works stock. The master and the District Court determined that these items should be included and we can see no basis for an inference to the contrary. Such an inference would fly in the face of the contract of of the parties to share expenses and of the agreement in Complainant's Exhibit 280B that "all subsequent expenses are to be split 25% Paul O. Buckley; 75% Ross W. Judson."

### Carnegie Metals Company Stock.

The District Court charged Buckley with the sum of $2,875, which is the difference between the cost of 1,200 shares of Carnegie Metals Company stock purchased through Clucas & Company and the price at which the shares might have been purchased had Buckley, who held an option on certain of these shares, made it available to Judson. The option was wholly Buckley's, and was not, so far as the proof indicates, to be treated as a part of the Judson-Buckley joint speculations. We cannot see that Buckley owed a duty to Judson to make the option available to him merely because Buckley was under fiduciary obligations as to other matters. Accordingly the item of $2,875 should be eliminated from Judson's claims and the judgment should be modified by reducing the principal thereof from $158,947.71 to $156,072.71, with proper adjustments of interest.

### Balance of $8,250 on Rosenbaum Note.

This note was given by Buckley to pay for the legal services of J. H. and L. N. Rosenbaum and Eugene Meacham, who acted for Judson in his income tax disputes with the government. The District Court found that the Rosenbaums and

Meacham had been fully paid before the note was given, and it found inferentially that there was no authority on the part of Buckley to pay this alleged debt. Nevertheless, the note was good as against Buckley, who had warranted his authority when he made commitments to pay the fees found to be excessive and unauthorized. Judson took up the note, paid the Rosenbaums and Meacham the amount called for thereby, and presented it as a good claim against Buckley in the present suit. Objection was made on the ground that the note was accommodation paper for the benefit of Judson, and therefore became unenforceable when it reached his hands. Judson, however, does not stand in the position of a holder of a negotiable instrument made for his accommodation, but rather became an assignee of a claim that was good as between Buckley and the Rosenbaums and Meacham, inasmuch as the note was not given for the accommodation of Judson but made by Buckley to pay a debt which Judson did not owe, but which Buckley did owe.

### Miscellaneous Claims.

Buckley further objects to the claims allowed against him on the Bulova Watch Company stock transaction amounting to $20,024.74; on the 2,500 shares of Bath Iron Works stock purchased by Buckley for Judson without authority, with a resulting loss (for which Buckley was charged) amounting to $14,190.91; on the Warren Foundries stock sales by Buckley below the market price, for loss on which he was charged with $3,845; on the sale of 333 shares of Warren Foundries stock belonging to Judson and converted by Buckley for which Buckley was charged with $6,490; and on Buckley's sale to Judson of his stock in Detroit Grey Iron Company at a price above its cost to Buckley for which he was charged with $687.50. The allowance to Judson of each of the foregoing claims depended on the determination of questions of fact by the trial court. We can discover no error in the disposition of any of the items.

The last matters to be dealt with are the questions relating to the allowance of interest and costs. The complainant criticizes the decree for not having allowed interest on the balance due him from a date earlier than that when suit was instituted, his claim being that it should have run from the date when the accounting between the parties should have been had.

It must be remembered that there were many disputes on both sides as to amounts due, by no means all of which have been resolved in the complainant's favor. The date when the account should have been rendered and the amount of the balance due were uncertain. Since the master found that Buckley's $272,510 in gross syndicate profits was subject to large deductions for expenses, it is clear that his mere receipt of that sum could not of itself fix the date of accounting or the balance due. Only the later appreciation in value of the remaining Bath Iron Works stock could open the way to the profits which were the sine qua non of a settlement of these accounts. Under the circumstances, we are not inclined to disturb the trial court in the exercise of its discretion fixing the time of bringing suit as the date from which interest should run.

The costs in the court below, other than the fees and expenses of the special master and the official stenographer, which were fixed by stipulation, should be borne to the extent of one-quarter by the complainant-appellant and three-quarters by the defendant-appellee. Costs of this appeal are to be borne in the same proportion.

Decree is to be modified in accordance with the foregoing opinion and cause remanded accordingly.